MATT O'MALLEY (SBN 272802)
PATRICK MCDONOUGH (SBN 288285)
San Diego Coastkeeper
2825 Dewey Rd # 207
San Diego, CA 92106
Ph: 619-758-7743
Email: matt@sdcoastkeeper.org

COAST LAW GROUP, LLP
MARCO A. GONZALEZ (SBN 190832)
LIVIA BORAK BEAUDIN (SBN 259434)
1140 South Coast Highway 101
Encinitas, CA 92024
Ph: (760) 942-8505
Fx: (760) 942-8515
Email: marco@coastlawgroup.com

Attorneys for Plaintiffs
SAN DIEGO COASTKEEPER, and COASTAL ENVIRONMENTAL RIGHTS FOUNDATION

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO COASTKEEPER, a non-profit corporation; COASTAL ENVIRONMENTAL RIGHTS FOUNDATION, a non-profit corporation, <br><br> Plaintiffs, <br> v. <br><br> ROBERTSON'S READY MIX, LTD., a California limited partnership, <br><br> Defendant. | Civil Case No. '20 CV1565 JM   MSB <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** <br><br> **(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*)** |

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

Coastal Environmental Rights Foundation, ("CERF") and San Diego Coastkeeper ("Coastkeeper") (collectively "Plaintiffs"), by and through their counsel, hereby allege:

## I.   JURISDICTION AND VENUE

1.     This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201.

2.     On June 4, 2020, Plaintiffs issued a 60-day notice letter ("Notice Letter") to Defendant Robertson's Ready Mix, Ltd. as owner and operator of the Facility located at 1310 Simpson Way, Escondido, CA 92029 ("Robertson's Facility" or "Facility"), regarding Defendant's violations of the Clean Water Act and California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ*), and *Order 2014-0057-DWQ as amended in 2015 and 2018* ("IGP"). True and correct copies of the Notice Letter and all enclosures are attached hereto as Exhibit 1 and incorporated herein.

3.     Plaintiffs also sent the Notice Letter to the registered agents for Defendant, the Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the California State Water Resources Control Board ("State Board"), and the Executive Officer of the San Diego Regional Water Quality Control Board ("Regional Board") as required by 40 C.F.R. § 135.2(a)(1) and 33 U.S.C. § 1365(b)(1)(A).

4.     More than sixty (60) days have passed since the Notice Letter was served on Defendant and the State and Federal agencies. Plaintiffs are informed and believe, and thereon allege, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and

in this Complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

5.     Venue is proper in the Southern District of California pursuant to 33 U.S.C. § 1365(c)(1) because the source of the violations is located within this judicial district.

## II.     INTRODUCTION

6.     Plaintiffs seek relief for Defendant's substantive and procedural violations of the IGP and the CWA resulting from its activities at the Robertson's Facility.

7.     Specifically, Defendant has discharged and continues to discharge polluted storm water from the Robertson's Facility to downstream waters and groundwater including Escondido Creek, the San Elijo Lagoon, and the Pacific Ocean (collectively "Receiving Waters") in violation of the express terms and conditions of the Clean Water Act, 33 U.S.C. §§ 1301, 1342.

8.     Defendant has also violated and continues to violate the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the IGP. These are ongoing and continuous violations of the Clean Water Act and the IGP.

9.     With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial facilities like the Robertson's Facility flow into storm drain systems, local tributaries, and the Receiving Waters.

10.     Among the Receiving Waters are ecologically sensitive areas providing essential habitat for dozens of fish, hundreds of bird, and numerous mammal species, as well as vital macro- and micro-invertebrate species which are an important link in the food web between the producers (leaves, algae) and higher consumers such as fish.

11.     This discharge of polluted storm water and non-storm water from the Facility causes and/or contributes to the impairment of downstream Receiving Waters and compromises or destroys their Beneficial Uses.

12.     Storm water and non-storm water contaminated with sediment, heavy metals, nutrients, and other pollutants harm the special biological significance of the

Receiving Waters. Discharges of polluted storm water and non-storm water to the Receiving Waters pose toxic, carcinogenic, and reproductive threats to the public and adversely affect the aquatic environment.

13. The polluted discharges from the Robertson's Facility also harm the special aesthetic and recreational significance that the Receiving Waters have for people in the surrounding communities, including Plaintiffs' members. The public's, including Coastkeeper's and CERF's members', use of the Receiving Waters for water contact recreation exposes people to toxic metals, carcinogenic chemicals, and other contaminants resulting from storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation and aesthetic enjoyment, are also impaired by polluted discharges, as such discharges cause or contribute to ecosystem and food web degradation.

## III.   **PARTIES**

14. Robertson's Ready Mix, Ltd. is an active California limited partnership and is the Owner and/or Operator of the Facility.

15. Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its main office in San Diego, California. Coastkeeper is committed to protecting and restoring the San Diego region's water quality and supply. A member of the international Waterkeeper Alliance, San Diego Coastkeeper's main purpose is to preserve, enhance, and protect San Diego's marine sanctuaries, coastal estuaries, wetlands and bays from illegal dumping, hazardous spills, toxic discharges, and habitat degradation.

16. Plaintiff CERF is a non-profit public benefit corporation organized under the laws of the State of California with its office located in Encinitas, California. CERF was founded by surfers in North San Diego County and is active throughout California's coastal communities. CERF was established to advocate for the protection and enhancement of coastal natural resources and the quality of life for coastal residents. One of CERF's primary areas of advocacy is water quality protection and enhancement.

17.     Many of Plaintiffs' members live and/or recreate in and around the Receiving Waters. Plaintiffs' members use and enjoy the Receiving Waters to fish, sail, boat, kayak, paddle board, surf, swim, hike, view wildlife and scenery, and engage in scientific studies, among other activities.

18.     Defendant's failure to comply with the procedural and substantive requirements of the IGP and the CWA results in discharges of polluted storm water to the Receiving Waters. Defendant's polluted discharges degrade water quality and harm aquatic life in the Receiving Waters and thus impair Plaintiffs' members' use and enjoyment of those waters.

19.     The violations of the IGP and CWA at the Robertson's Facility are ongoing and continuous. Thus, the interests of Plaintiffs' members have been and will continue to be adversely affected by Defendant's failure to comply with the IGP and the CWA.

20.     The relief sought herein will redress the harms to Plaintiffs' members caused by Defendant's activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs' members, for which they have no other plain, speedy, or adequate remedy at law.

21.     An actual controversy exists as to the rights and other legal relations between Defendant and Plaintiffs.

## IV.     LEGAL BACKGROUND

### A.     The Clean Water Act.

22.     The CWA requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); 40 C.F.R. § 122.26(c)(1).

23.     Section 301(a) of the Clean Water Act prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the CWA.

24.     "Waters of the United States" are defined as "navigable waters" and "all waters which are currently used, were used in the past, or may be susceptible to use in

interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

25. The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

26. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce. *See* 40 C.F.R. § 122.2.

27. The CWA confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water.

28. The CWA requires all point source dischargers, including those discharging polluted storm water, achieve technology-based effluent limitations by utilizing the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 33 U.S.C. § 1311(b); 40 C.F.R. §125.3(a)(2)(ii)–(iii).

**B.    California's IGP.**

29. Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. It allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water.

30. California is a state authorized by the EPA to issue NPDES permits. In California, the State Board is charged with regulating pollutants to protect California's water resources. Cal. Water Code § 13001.

31. The IGP is a statewide general NPDES permit issued by the State Board pursuant to Section 402 that regulates the discharge of pollutants from industrial sites.

32. Between 1997 and June 30, 2015, the IGP in effect was *Order No. 97-03-DWQ* ("1997 Permit"). On July 1, 2015, pursuant to *Order No. 2014-0057-DWQ* ("2015 Permit"), the reissued 2015 IGP took effect. The 2015 Permit supersedes the 1997

Permit, except for enforcement purposes, and its terms are as stringent, or more stringent, than the terms of the 1997 Permit. On July 1, 2020, pursuant to *Order 2014-0057-DWQ as amended in 2015 and 2018* ("2020 Permit"), the reissued 2020 IGP took effect.

33.     In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the IGP and comply with its terms or obtain and comply with an individual NPDES permit. 1997 Permit, Finding 2; 2015 Permit § I.A.12; 2020 Permit § I.A.12. Prior to beginning industrial operations, dischargers are required to apply for coverage under the IGP by submitting a Notice of Intent to Comply with the IGP ("NOI") to the State Board. 1997 Permit, Finding 3; 2015 & 2020 Permit § I.A.17.

34.     Violations of the IGP are violations of the Clean Water Act. 1997 Permit § C.1; 2015 & 2020 Permit § XXI.A.

**C.     The IGP Discharge Prohibitions.**

35.     The IGP contains certain absolute prohibitions. "All discharges of storm water to waters of the United States are prohibited except as specifically authorized by this General Permit or another NPDES permit." 2015 & 2020 Permit § III.A.

36.     The Discharge Prohibitions forbid the direct or indirect discharge of liquids or materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. 1997 Permit § A.1; 2015 & 2020 Permit § III.B.

37.     These provisions further prohibit storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance. 1997 Permit § A.2; 2015 & 2020 Permit § III.C.

38.     The IGP prohibits discharges that violate any discharge prohibitions contained in local Water Quality Control Plans ("Basin Plan") or statewide water quality control plans and policies. 2015 & 2020 Permit § III.D.

39.     The San Diego Basin Plan prohibits "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives." Basin Plan at 4-20.

40.     Accordingly, where the discharge does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 and 2020 Permits.

**D.     The IGP Effluent Limitations.**

41.     The IGP Effluent Limitation requires permittees to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of BAT and BCT. 1997 Permit § B.3; 2015 & 2020 Permit § V.A.

42.     Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include chemical oxygen demand ("COD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, nitrate + nitrite nitrogen ("N+N"), iron, phosphorus, enterococcus, and fecal coliform, among others.

43.     Dischargers must develop and implement Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); 1997 Permit § B.3; 2015 & 2020 Permit § V.A.

44.     EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"). The Benchmarks provide a relevant and objective standard to determine whether a facility's BMPs are effectively developed and implemented to achieve compliance with BAT/BCT standards. *See* MSGP, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); *see also* 2015 MSGP Fact Sheet at 50.

45.     Failure to develop or implement BMPs that constitute BAT and BCT is an IGP violation. 33 U.S.C. § 1311(b); 1997 Permit § B.3; 2015 & 2020 Permit § V.A.

46.     The 2015 MSGP freshwater EPA Benchmarks include, but are not limited to: 100 mg/L for TSS; 15 mg/L for Oil and Grease; pH is 6.0–9.0 s.u; .68 mg/L for N+N; .75 mg/L for aluminum; .014 mg/L for copper; .082 mg/L for lead; .005 mg/L for selenium; and .12 mg/L for zinc. 2015 MSGP Fact Sheet at 55–56.

### E.     The IGP Receiving Water Limitations.

47.     The IGP Receiving Water Limitation prohibits storm water discharges and authorized non-storm water discharges from adversely impacting human health or the environment. 1997 Permit § C.1; 2015 & 2020 Permit § VI.B.

48.     Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the IGP's Receiving Water Limitations. *Id.*

49.     The IGP Receiving Water Limitation prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standard contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. 1997 Permit § C.2; 2015 & 2020 Permit § VI.A.

50.     Water quality standards ("WQSs") consist of both "designated uses" for a body of water and a set of "criteria" specifying the maximum concentration of pollutants that may be present in the water without impairing its suitability for designated uses. 33 U.S.C. § 1313(c)(2)(A).

51.     WQSs applicable to dischargers covered by the IGP include, but are not limited to, those set out in the Basin Plan, and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38. Both the CTR and Basin Plan WQSs must be attained at the point of discharge.

52.     The Basin Plan identifies designated "Beneficial Uses" for water bodies in the San Diego region under Clean Water Act section 303. 40 C.F.R. § 131.

53.     The Beneficial Uses for Escondido Creek downstream from the Robertson's Facility's include: municipal and domestic supply; agricultural supply; potential industrial service supply; contact water recreation; non-contact water recreation; warm freshwater habitat; cold freshwater habitat; and wildlife habitat. Basin Plan, Table 2-2.

54.     The Beneficial Uses for the San Elijo Lagoon include: contact water recreation; non-contact water recreation; wildlife habitat; preservation of biological habitats of special significance; estuarine habitat; marine habitat; spawning, reproduction,

and/or early development; migration of aquatic organisms; and rare, threatened, or endangered species. *Id.*, Table 2-3.

55.     Pacific Ocean Beneficial Uses include: industrial service supply; navigation; contact water recreation; non-contact water recreation; commercial and sport fishing; wildlife habitat; preservation of biological habitats of special significance; marine habitat; migration of aquatic organism; spawning, reproduction, and/or early development; shell harvesting; aqua culture; and rare, threatened, or endangered species. *Id.*

56.     Surface waters that cannot support their Beneficial Uses are designated "impaired" water bodies pursuant to Section 303(d) of the Clean Water Act.

57.     According to the 2016 303(d) List, Escondido Creek is impaired for benthic community effects, bifenthrin, DDT, indicator bacteria (such as enterococcus and E. coli), malathion, manganese, nitrogen, phosphate, selenium, sulfates, total dissolved solids, and toxicity.

58.     Data collected by Coastkeeper from 2008 to 2018, publicly available on the California Environmental Data Exchange Network ("CEDEN"), indicates Escondido Creek is also impaired for phosphorus. Additional Receiving Water monitoring data in CEDEN indicates Escondido Creek is also impaired for iron, zinc, and phosphorus.

59.     According to the 2016 303(d) List, the San Elijo Lagoon is impaired for eutrophic conditions, indicator bacteria, sedimentation/siltation, and toxicity.

60.     According to the 2016 303(d) List, the Pacific Ocean Shoreline, at Cardiff State Beach at San Elijo Lagoon is impaired for indicator bacteria.

61.     Polluted discharges from industrial facilities, such as the Robertson's Facility, contribute to the degradation of these already-impaired surface waters, as well as aquatic-dependent wildlife.

62.     The following WQS are established by the Basin Plan for Escondido Creek: nitrogen, 1.0 mg/L; phosphorus, 0.1 mg/L; iron, 0.3 mg/L; manganese, 0.05 mg/L; pH "shall not be depressed below 6.5 or raised above 8.5." Basin Plan at 3-13; 3-26.

63.     The CTR includes numeric criteria set to protect human health and the

environment. Based on 100mg/L hardness, the CTR maximum freshwater concentrations include: copper, 0.013 mg/L; lead, 0.065 mg/L; selenium, 0.005 mg/L; zinc, 0.12 mg/L. 40 C.F.R. § 131.38.

64.   Because the IGP Receiving Water Limitation prohibits discharges that cause or contribute to an exceedance of any applicable WQS, discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQSs, absent any authorized mixing or dilution zone, are violations of Receiving Water Limitations of the IGP. *See* 1997 Permit § C.2; 2015 & 2020 Permit § VI.A.

**F.      The IGP Storm Water Pollution Prevention Plan Requirements.**

65.   Prior to beginning industrial activities, dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). 1997 Permit §§ A.1.a, E.2; 2015 & 2020 Permit §§ X.A–B.

66.   The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. 1997 Permit § A.2; 2015 & 2020 Permit § X.

67.   The SWPPP must include, among other things: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating

activities; a description of individuals and their current responsibilities for developing and implementing the SWPPP, and a Monitoring Implementation Plan. 1997 Permit §§ A.1–10; 2015 & 2020 Permit §§ X.A–I.

68.     Dischargers must evaluate their SWPPP at least annually and revise it as necessary to ensure compliance with the IGP. 1997 Permit §§ A.9–10; 2015 Permit §§ I.J.55, X.A.9, X.B.1; 2020 Permit §§ I.K.69, X.A.9, X.B.1. The 2015 and 2020 Permits require dischargers to certify and submit via the Storm Water Multiple Application & Report Tracking System ("SMARTS") database their SWPPP within 30 days whenever the SWPPP contains significant revisions. 2015 & 2020 Permit § X.B.2.

69.     The IGP requires dischargers to conduct an annual comprehensive site compliance evaluation that includes, *inter alia*, a review of all visual observation records, sampling and analysis results, and a review and evaluation of all BMPs. 1997 Permit §§ A.9.a–c; 2015 & 2020 Permit § XV.

### G.     The IGP Monitoring and Reporting Requirements.

70.     Permittees must develop and implement a monitoring implementation plan ("MIP"). 1997 Permit §§ B.1–2, E.3; 2015 & 2020 Permit, §§ X.I, XI. The MIP objectives are to ensure BMPs have been adequately developed, implemented, and revised, and confirm compliance with the IGP's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 1997 Permit §§ B.2.; 2015 Permit §§ I.J.55–56, X.I, XI; 2020 Permit §§ X.I, X, I.K.69–70.

71.     The MIP thus aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. 1997 Permit §§ B.2.a, B.2.d; 2015 Permit § XX.B; 2015 Permit Fact Sheet § J at 43; 2020 Permit Fact Sheet § J at 138.

72.     The IGP requires dischargers conduct monthly visual observations of storm water discharges, storm water drainage areas, and for the presence of unauthorized non-storm water discharges. 1997 Permit §B.4.a; 2015 & 2020 Permit § XI.A.1.

73.     Section B.5.a of the 1997 Permit required dischargers to collect storm water

samples during the first hour of discharge from the first storm event of the Wet Season and at least one other storm event in the Wet Season. All storm water discharge locations must be sampled. *Id.* Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm events of the Wet Season and must explain in the Annual Report why the first storm event was not sampled. *Id.*

74.    Section XI.B.1 of the 2015 and 2020 Permits require sampling from a qualifying storm event ("QSE"), which is a precipitation event that produces a discharge for at least one drainage area and is preceded by forty-eight (48) hours with no discharge from any drainage area.

75.    The 2015 Permit defines Reporting Year as July 1 through June 30. 2015 Permit § I.M.62.b; 2020 Permit § I.N.76.b. Section XI.B.2 of the 2015 and 2020 Permits require dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each Reporting Year (July 1 to December 31), and two (2) QSEs within the second half of each Reporting Year (January 1 to June 30).

76.    Section XI.B.11 of the 2015 and 2020 Permits, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via the SMARTS database within thirty days of obtaining the results.

77.    The 1997 Permit required dischargers to analyze each sample for at least pH, specific conductance, TSS, and total organic carbon, while the 2015 and 2020 Permits require dischargers to analyze samples for TSS, O&G, and pH, at a minimum.

78.    The 1997 Permit further required dischargers to analyze each sample for toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharged from the facility.

79.    The 2015 and 2020 Permits require dischargers to analyze samples for other pollutants likely to be present in significant quantities in the storm water discharged from the facility that serve as indicators of the presence of all industrial pollutants.

80.    The 2015 and 2020 Permits also require dischargers to analyze storm water

samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved Total Maximum Daily Loads.

81.     Section B.14 of the 1997 Permit required that dischargers submit an Annual Report to the applicable Regional Board by July 1 of each year. The Annual Report must include (1) a summary of visual observations and sampling results, (2) an evaluation of the visual observations and sampling and analysis results, (3) laboratory reports, (4) the annual comprehensive site compliance evaluation report specified in Section A(9), (5) an explanation of why a facility did not implement any activities required, and (6) the records specified in Section B.13.i. *Id.*

82.     Section C.11.d of the 1997 Permit required facility operators to report any incidence of noncompliance with the Industrial Permit at the time monitoring reports are submitted. Reports of noncompliance must contain (1) a description of noncompliance and its cause, (2) the period of noncompliance, including exact dates and times, and if the noncompliance has not been corrected, the anticipated time it is expected to continue, and (3) steps taken or planned to reduce and prevent recurrence of the noncompliance. 1997 Permit § C.11.d.

83.     The 2015 and 2020 Permits require dischargers to submit an annual report to the applicable Regional Board by July 15 of each year. The Annual report must include a (1) Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the 2015 Permit, (2) an explanation for any non-compliance of requirements within the Reporting Year (3) an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the Reporting Year, and (4) the date(s) of the Annual Evaluation.

84.     The IGP requires that all reports, certifications, or other information required by the Permit or requested by a regional board are signed by an authorized facility and certified for accuracy. 1997 Permit § C.9; 2015 & 2020 Permit § XXI.K.

## V.     FACTUAL BACKGROUND

### A.     Facility Site Information, Industrial Activities, and Pollutant Sources.

85.     The 2.02-acre Robertson's Facility first obtained IGP coverage to conduct industrial operations on November 14, 2011. The Facility submitted its most recent Notice of Intent ("NOI") to obtain IGP coverage under the 2015 Permit on January 12, 2018 ("2018 NOI"), under Waste Discharge Identification Number 9 7I023400.

86.     The Facility Standard Industrial Classification ("SIC") code is 3273 (ready-mixed concrete). General categories of industrial activities at the Facility include concrete production, mobile equipment operation, fueling and maintenance, hazardous material handling and storage, and various dust and particulate generating activities.

87.     After receiving Plaintiffs' Notice Letter, Defendant updated its 2015 SWPPP. The most recent SWPPP (dated June 2020) states "[r]aw materials including aggregate (rock, sand, and gravel), cement fly ash, and admixtures are delivered to the site. These materials are mixed with water in a batch plant to create concrete," which is thereafter loaded into delivery trucks and shipped to customers.

88.     As part of concrete production, aggregate materials are transported to the batch plant via conveyor belts, which are exposed to storm water.

89.     The batch plant is not routinely cleaned, but the mixer trucks are washed in the concrete wash out area in the northwestern corner of the Facility. This industrial activity generates waste water that collects in a shallow retention pond during normal operations.  Excess concrete is removed from the mixer trucks and stored, allowed to dry, crushed by a mobile crushing unit at the Facility, and thereafter hauled offsite.

90.     Plaintiffs are informed, believe, and thereon allege, based on, *inter alia*, the 2019 Staff Enforcement Letter ("SEL") and a Notice of Violation ("2019 NOV") issued by the Regional Board on July 17, 2019, that waste water pools in the truck wash shallow basin where trucks and other vehicles frequently traverse. Vehicles thus track this waste water out of the basin and into other areas of the Facility. The 2019 NOV includes photos and descriptions of pollutant track out in violation of Section X.H.1.a.ii of the 2015 and 2020 Permits.

91.     The SWPPP identifies numerous industrial materials that are stored,

handled, and/or otherwise used at the facility, including: aggregate materials composed of rock, sand, and gravel; cement; fly ash; concrete admixtures; diesel fuel; lubricating oils such as motor oil, hydraulic oil, and transmission fluid; and other materials such as antifreeze, brake cleaner, grease, and battery acid.

92.    According to the Regional Board's 2019 SEL and NOV, the Facility also handles and stores significant quantities of waste concrete material.

93.    The industrial activities most likely to contribute pollutants to storm water and non-storm water are concrete production via spills and leaks of aggregate material, cement, fly ash, and returned concrete; mobile equipment operations via spills from equipment failure and fueling, and waste materials generation during maintenance activities; and hazardous material storage via spills from loading, unloading, storage, transfer, and use.

94.    The Facility's concrete production activities generate dust from loading aggregate, fly ash, and cement into mixing drums.

95.    Though the SWPPP claims the only pollutants likely to be present in storm water discharges include O&G, iron, pH affecting substances, and TSS, Plaintiffs are informed, believe, and thereon allege the Facility's concrete production activities produce additional pollutants, including but not limited to phosphorus, nitrogen, zinc, copper, lead, arsenic, mercury, and cadmium.

96.     Cement dust and fly ash are harmful, toxic, and carcinogenic. Fly ash frequently contains lead, arsenic, mercury, and cadmium. Cement dust in the United States commonly contains mercury, copper, chromium, hexavalent cadmium, nickel, manganese, lead, and iron. Many of these pollutants are considered toxic under the CTR, and all are regulated by the IGP and Clean Water Act. 40 C.F.R. § 131.38.

97.    The most recent SWPPP admits cement dust is very fine and is difficult to fully control to a level that totally eliminates the risk of measured exceedances of applicable Numeric Action Levels.

98.     Documents obtained from the San Diego Air Pollution Control District

1  demonstrate that the Facility emits aluminum, arsenic, barium, beryllium, cadmium,

2  cobalt, copper, lead, manganese, nickel, selenium, silica, and zinc as a result of its daily

3  industrial activities.

4     99.   The Regional Board's March 25, 2019 SEL includes multiple photos of

5  industrial and waste material spills, as well as evidence of mobilization of these materials

6  by storm water.

7     100.   In a letter to the Regional Board, dated April 15, 2019, Robertson's Ready-

8  Mix itself explained that "[p]reventing all spills of materials at the Facility is simply not

9  possible.

10    101.   The 2019 SEL and NOV, and numerous accompanying photographs and

11  descriptions, demonstrate that process water, wash water, and other non-storm water at

12  the Facility frequently commingle with storm water. Specifically, the water used to wash

13  trucks, as well as to wash pavement near the solid concrete waste piles, either flows into

14  the storm water basin, or is tracked through various areas of the Facility and thus

15  discharges with storm water.

16    102.   Based on the foregoing, Plaintiffs are informed, believe, and thereon allege

17  that numerous additional pollutants associated with industrial activity are present in the

18  Facility's storm water discharges, including aluminum, arsenic, barium, beryllium,

19  copper, chromium, hexavalent chromium, cadmium, cobalt, lead, nickel, manganese,

20  mercury, zinc, selenium, nitrogen, and phosphorus.

21    103.   Plaintiffs are informed, believe, and thereon allege that industrial activities

22  occur, and industrial materials are handled, at various locations throughout the

23  Robertson's Facility either outdoors without adequate cover to prevent storm water and

24  non-storm water exposure to pollutant sources, and/or without adequate secondary

25  containment or other adequate treatment measures to prevent polluted storm water and

26  non-storm water from discharging from the Facility.

27    104.   Plaintiffs are informed, believe, and thereon allege that many pollutants

28  associated with industrial activities occurring indoors or under partial shelter at the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES     17

Facility regularly escape via dust emissions, wind dispersion, vehicle track out, or otherwise, resulting in pollutant dispersal throughout the Facility.

105.   Plaintiffs are informed, believe, and thereon allege that pollutants associated with the Facility's industrial activities have been and continue to be tracked by vehicles and dispersed via wind throughout the entire site, and on and off the Facility through ingress and egress. This results in trucks and vehicles tracking pollutants off-site, and aerial deposition of pollutants throughout the Facility as well as offsite.

106.   The 2019 NOV includes photos and descriptions of pollutant track out evidencing violations of Section X.H.1.a.ii of the 2015 and 2020 Permits.

107.   Plaintiffs are informed, believe, and thereon allege that one or more regulated industrial activities are conducted at locations throughout the entire Facility, and thus the entire Facility requires IGP coverage.

108.   Plaintiffs are informed, believe, and thereon allege that even if regulated industrial activities are not conducted at all locations throughout the entire Facility, BMPs or other controls do not adequately separate the storm water flows from portions of the Facility where non-regulated activities may occur from storm water flows from the regulated industrial activities.

109.   Plaintiffs are informed, believe, and thereon allege that, due to both the Facility's lack of BMPs, and inadequacy of existing BMPs, storm water from areas of the Facility where industrial activities are conducted commingles with storm water from other areas of the Facility, and wash water, process water, and other non-storm water commingle with storm water, and thus all discharges from the Facility are regulated under the IGP.

110.   Plaintiffs are informed, believe, and thereon allege that industrial activities at the Robertson's Facility generate significant amounts of numerous pollutants. During rain events, these pollutants are washed off surfaces throughout the facility and into storm water discharge points, which flow to Receiving Waters.

111.   Plaintiffs are informed, believe, and thereon allege that Defendant has failed

and continues to fail to develop and/or implement required BMPs to prevent discharges of all non-storm water in violation of the IGP and the Clean Water Act.

112.   Plaintiffs are informed, believe, and thereon allege that Defendant has discharged and continues to discharge polluted storm water and non-storm water from the Facility in violation of the IGP.

113.   Plaintiffs are informed, believe, and thereon allege that the Robertson's Facility's polluted discharges have caused and/or contributed, and continue to cause and/or contribute, to the impairment of water quality in Receiving Waters in violation of the IGP.

114.   Plaintiffs are informed, believe, and thereon allege that elevated levels of numerous pollutants have resulted in the inability of Receiving Waters to support their Beneficial Uses.

115.   Plaintiffs are informed, believe, and thereon allege that the illegal discharges of polluted storm water and non-storm water from the Robertson's Facility impact Coastkeeper and CERF's members' use and enjoyment of the Receiving Waters by degrading the quality of those waters, and by posing risks to human health and aquatic life.

**B.     Facility Drainage Areas, Storm Water Flow, and Discharge Locations.**

116.   The 2020 SWPPP states that the site has three drainage areas. Drainage Area 1 ("DA1") "consists of the central portion of the site and encompasses the entire property except for the driveways." Storm water within DA1 flows to a retention basin in the northeast corner of the Facility which discharges to a City of Escondido storm water channel via Outfall 1 ("OF1"). The SWPPP does not detail the capacity of the basin and claims it discharges only in "extreme circumstances."

117.   Plaintiffs are informed, believe, and thereon allege, based on inspection photos and documents from the Regional Board and the City of Escondido, that the northeastern basin overflows with much greater regularity than articulated in the SWPPP.

118.   Defendant has failed to state any specific capacity of the northeastern basin.

119.   According to the SWPPP, "Drainage Area 2 ("DA2") consists of the west driveway, which serves as the facility exit," and storm water from DA2 discharges directly to Simpson Way via Outfall 2. "Drainage Area 3 ("DA3") consists of the east driveway, which serves as the facility entrance," and storm water from DA3 flows to a grate drain located on the east side of the driveway, which discharges directly to the adjacent City of Escondido storm water channel via Outfall 3. The 2015 SWPPP claims that "no industrial operations occur" within DA2 or DA3.

120.   Plaintiffs are informed, believe, and thereon allege that industrial activities do occur within DA2 and DA3.

121.   Plaintiffs are informed, believe, and thereon allege the Facility's retention capacity is modest as compared to the Facility's impervious surface area, and that as such, the Robertson's Facility will discharge storm water during most QSEs.

122.   City of Escondido storm water drainage channels border the Facility's northern and eastern boundaries. Storm water and non-storm water discharges from the Facility flow into these City of Escondido drainage channels, which flow downstream to Escondido Creek, San Elijo Lagoon, and eventually to the Pacific Ocean via the mouth of the lagoon at Cardiff State Beach.

**C.   The Robertson's Facility Discharges Contaminated Storm Water in Violation of the IGP.**

123.   Plaintiffs are informed, believe, and thereon allege that with every significant rain event, the Robertson's Facility discharges polluted storm water via storm drainage systems into the Receiving Waters.

124.   Plaintiffs are informed, believe, and thereon allege that the Receiving Waters into which the Defendant discharges polluted storm water are waters of the United States and therefore the IGP properly regulates discharges to those waters.

125.   Plaintiffs are informed, believe, and thereon allege that storm water and non-storm water discharges from the Robertson's Facility violate the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations of the IGP.

### 1. Discharges of Polluted Storm Water from the Robertson's Facility Violate IGP Discharge Prohibitions.

126.   Plaintiffs are informed, believe, and thereon allege the Robertson's Facility has discharged unauthorized non-storm water discharges ("NSWD") in violation of the IGP. *See* 1997 Permit § A.1; 2015 Permit § III.B; 2020 Permit § III.B.

127.   During a Regional Board inspection of the Facility conducted on February 6, 2019, the inspector observed that process water was allowed to commingle with industrial storm water. 2019 NOV. Robertson's staff described this water as wash water used on solid concrete waste piles and to wash down pavement. *Id.*

128.   The 2019 NOV specifically cited the Facility for failing to prevent the disposal of rinse and wash water into the storm water conveyance system in violation of Sections X.H.1.a.iv and X.H.1.a.vii of the 2015 Permit.

129.   The Regional Board inspector observed that this process water drained through straw waddles, and into the Facility's northeastern retention basin. As stated by the Regional Board in the 2019 NOV, "[s]traw waddles are permeable and will not prevent industrial process water from commingling with storm water." *Id.*

130.   Robertson's staff confirmed that the commingled water is stored onsite and discharges once the basin's containment capacity is exceeded. *Id.*

131.   Plaintiffs are informed, believe, and thereon allege Defendant has failed to develop and/or implement BMPs that would prevent these NSWDs from comingling and/or discharging from the Facility in violation of the IGP.

132.   The 2019 NOV cites the Facility for failure to prohibit NSWDs in violation of Section III.B of the 2015 Permit.

133.   Each time Defendant discharges prohibited non-storm water in violation of Discharge Prohibition III.B. of the Permit is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

134.   Plaintiffs are informed, believe, and thereon allege that the Robertson's Facility has discharged and continues to discharge numerous pollutants in concentrations

that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of IGP. *See* 1997 Permit § A.2; 2015 & 2020 Permit § III.C.

135.   The California Water Code defines "contamination" as "an impairment of the quality of the waters of the state by waste to a degree which creates a hazard to the public health through poisoning or through the spread of disease."

136.   "Pollution" is defined as "an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects . . . [t]he waters for beneficial uses."

137.   City of Escondido Environmental Programs inspections conducted in December of 2018 demonstrate that the Robertson's Facility illegally discharged milky, muddy, discolored water into the storm drain channel. On or about December 12, 2018, the City of Escondido ordered the Facility to cease such discharges, and to hire an environmental company to clean out the City's storm water channel to mitigate the pollution and contamination in the channel.

138.   Plaintiffs are informed, believe, and thereon allege the Facility's discharges of polluted storm water have violated the IGP's Discharge Prohibition III.C.

139.   Waste Discharge Prohibition number 5 of the San Diego Basin Plan states, "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives, is prohibited."

140.   "Waste" is defined as, "waste substances, liquid, solid, gaseous, or radioactive, associated with human habitation, or of human or animal origin, or from any producing, manufacturing, or processing operation," which includes discharges of pollutants in storm water. California Water Code, § 13050(d).

141.   Accordingly, where the "quality of the discharge" does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 and 2020 IGP.

142.   Information available to Plaintiffs, including its review of publicly available

information and observations, indicates that no express allowance for dilution has been granted to the Robertson's Facility's discharges or to the downstream Receiving Waters.

143.   Plaintiffs are informed, believe, and thereon allege, based on inspection notes and photos from the City of Escondido and the Regional Board, and direct observations, that Defendant has violated and continues to violate Discharge Prohibition III.D of the 2015 and 2020 IGP by discharging pollutants in excess of water quality objectives.

144.   Plaintiffs are informed, believe, and thereon allege that the Facility has discharged storm water with concentrations of numerous pollutants in excess of the CTR standards and Basin Plan Water Quality Objectives in violation of the IGP.

145.   Defendant's failures to collect storm water samples in accordance with the IGP and to analyze such samples for all required pollutants, do not excuse the Facility's violations of the Discharge Prohibitions provisions of the IGP.

146.   Each time the Robertson's Facility discharges polluted storm water in violation of Sections III.B, III.C, or III.D of the Discharge Prohibitions provisions of the IGP is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

147.   These Discharge Prohibition violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that prevent such discharges.

**2.  Discharges of Polluted Storm Water from the Robertson's Facility Violate IGP Effluent Limitations.**

148.   Plaintiffs are informed, believe, and thereon allege that Defendant has failed and continues to fail to develop and/or implement BMPs as required to achieve compliance with the BAT/BCT standards to prevent the discharge of polluted storm water from the Facility. *See* 1997 Permit § B.3; 2015 & 2020 Permit § V.A.

149.   The Facility's December 2018 milky, discolored discharges demonstrate that the Facility BMPs fail to achieve BAT/BCT and that its discharges contain pollutants in

concentrations exceeding EPA Benchmarks. The Facility failed to collect any samples from this discharge.

150.   The Regional Board's inspection on February 6, 2019, and accompanying photographs showing evidence of pollutant track out, industrial and waste material spills and mobilization by storm water, and commingling of process water and storm water, confirm that the Facility's BMPs fail to achieve BAT/BCT and that the Facility continues to discharge pollutants in excess of EPA Benchmarks.

151.   Each time Defendant discharges polluted storm water in violation of Effluent Limitation B.3 of the 1997 Permit and Effluent Limitation V.A of the 2015 and 2020 Permits is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). These effluent limitation violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards.

152.   Plaintiffs are informed, believe, and thereon allege that the Facility has been in violation of these Effluent Limitations since June 4, 2015 and is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

### 3. Discharges of Polluted Storm Water from the Robertson's Facility Violate IGP Receiving Water Limitations.

153.   Plaintiffs are informed, believe, and thereon allege that the Robertson's Facility has violated and continues to violate IGP Receiving Water Limitations.

154.   Plaintiffs are informed, believe, and thereon allege the Facility discharges elevated concentrations of several toxic metals in excess of CTR standards.

155.   Arsenic, mercury, copper, cadmium, nickel, lead, and hexavalent chromium, selenium, and zinc are all toxic metals which are associated with concrete production,

156.   Receiving Waters downstream from the Facility are impaired, and thus unable to support the designated Beneficial Uses, for some of the same pollutants discharged by the Facility.

157.   According to the 2016 303(d) List of Impaired Water Bodies, both Escondido Creek and the San Elijo Lagoon are impaired for toxicity.

158.   Plaintiffs are informed, believe, and thereon allege the Facility's discharges of these toxic metals in excess of the CTR standards cause and/or contribute to the toxicity impairment of Escondido Creek and the San Elijo Lagoon.

159.   Plaintiffs are informed, believe, and thereon allege the milky, discolored discharges described by the December 12, 2018 City of Escondido inspection demonstrate the Facility storm water and non-storm water discharges contain elevated concentrations of TSS in excess of the Basin Plan Water Quality Objective and cause and/or contribute to the impairment of Escondido Creek in violation of the Receiving Water Limitations of the IGP.

160.   The Basin Plan sets forth a narrative standard for TSS mandating that "[w]aters shall not contain suspended and settleable solids in concentrations of solids that cause nuisance or adversely affect beneficial uses." Milky, muddy, discolored discharges indicate high concentrations of TSS.

161.   According to the 2016 303(d) List of Impaired Water Bodies, Escondido Creek is impaired for benthic community effects. The Basin Plan explains that "[s]uspended and settleable solids are deleterious to benthic organisms and may cause the formation of anaerobic conditions. They can clog fish gills and interfere with respiration in aquatic fauna. They also screen out light, hindering photosynthesis and normal aquatic plant growth and development." Basin Plan at 3-31.

162.   Escondido Creek is impaired, and thus unable to support these designated beneficial uses, for some of the very pollutants likely found in the Facility's discharges, including manganese, nitrogen, phosphorus, selenium, and total dissolved solids.

163.   The Creek is further impaired for manganese, which also impacts the municipal & domestic supply beneficial use.

164.   The Facility's storm water discharges containing elevated concentrations of total dissolved solids, nitrogen, phosphorus and manganese in excess of respective Basin

Plan Water Quality Objectives cause and/or contribute to the benthic community effects impairments of Escondido Creek in violation of the Receiving Water Limitations of the IGP.

165.   Plaintiffs are informed, believe, and thereon allege that discharges of elevated concentrations of pollutants from the Robertson's Facility also adversely impact human health, thus violating the Permit Receiving Water Limitation C.1 of the 1997 Permit, and VI.B of the 2015 and 2020 Permits.

166.   Each time Defendant discharges polluted storm water in violation of the IGP's Receiving Water Limitations is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

167.   Plaintiffs are informed, believe, and thereon allege that the Facility's discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the IGP's Receiving Water Limitations.

168.   Plaintiffs are informed, believe, and thereon allege that the Facility has been in violation since June 4, 2015 and Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

**D.    Defendant Has Violated and Continues to Violate IGP SWPPP Requirements.**

169.   Plaintiffs are informed, believe, and thereon allege that Defendant has conducted and continues to conduct operations at the Facility with an inadequately developed and/or implemented SWPPP.

170.    Plaintiffs are informed, believe, and thereon allege that the Facility's site map and description of the Facility's drainage areas are inconsistent and/or inaccurate in violation of the IGP.

171.   Section 4.0 of the 2015 SWPPP states that storm water within in DA1, which encompasses almost the entire Facility, flows to the northeastern retention basin. However, Section 1.0 of the SWPPP states that the batch plant is constructed in a shallow retention pond, and that waste water and wash water generated in this area flows into a

sump and reclaimer system, which are all located within DA1.

172.   Neither the site map, nor the SWPPP delineate from which areas water flows to the larger northeastern basin, and which areas retain storm water within the shallow basin and sumps near the batch plant.

173.   Plaintiffs are informed, believe, and thereon allege that waste water from the concrete batch plant area commingles with storm water that flows to the northeast retention basin.

174.   Plaintiffs are informed, believe, and thereon allege Defendant has failed and continues to fail to develop and/or implement a SWPPP that contains BMPs to adequately prevent the exposure of pollutants to storm water, commingling of process and wash water with storm water, and the subsequent discharge of pollutants from the Facility, as required by the IGP.

175.   Plaintiffs are informed, believe, and thereon allege Defendant has failed and continues to fail to develop and/or implement a SWPPP that includes an adequate pollutant source assessment.

176.   Numerous harmful, toxic, and carcinogenic pollutants are likely present in onsite materials, particularly in fly ash and cement dust. Fly ash can contain lead, arsenic, mercury, and cadmium. Cement dust in the United States commonly contains mercury, copper, chromium, hexavalent chromium, cadmium, nickel, manganese, lead, and iron.

177.   San Diego Air Pollution Control District documents suggest the Facility emits aluminum, arsenic, barium, beryllium, cadmium, cobalt, copper, lead, manganese, nickel, selenium, and zinc as a result of its daily industrial activities. The failure of the SWPPP to assess or acknowledge these pollutants is particularly egregious as many of these pollutants are considered toxic.

178.   The Regional Board's 2019 NOV includes photos and descriptions of pollutant track out in violation of Section X.H.1.a.ii; failure to prohibit NSWDs in violation of Section III.B; failure to prevent the disposal of rinse and wash water into the storm water conveyance system in violation of Sections X.H.1.a.iv & vii; and numerous

leaks and spills evidencing the Facility's failure to implement good housekeeping BMPs to prevent the disposal of industrial materials and wastes into the storm water conveyance system in violation of Section X.H.1.a.vii of the 2015 Permit.

179.    Plaintiffs are informed, believe, and thereon allege that Defendant has failed to develop and/or implement BMPs that adequately: minimize the exposure of pollutants to storm water at the Facility; control and minimize polluted runoff from the Facility; treat and remove pollutants in storm water prior to discharge; prevent or control contaminated storm water from being discharged from the Facility; prevent or control contaminated NSWDs from being discharged from the Facility.

180.    Plaintiffs are informed, believe, and thereon allege that the Facility SWPPP fails to adequately analyze the effectiveness of the Facility's existing BMPs.

181.    Plaintiffs are informed, believe, and thereon allege that the inadequacy of the BMPs at the Robertson's Facility is in part a result of Defendant's failure to develop, implement, and revise an adequate SWPPP.

182.    Plaintiffs are informed, believe, and thereon allege that Defendant's failure to adequately revise the Facility's SWPPP, and thus failure to improve the Facility's BMPs ensures that the Facility will continue to operate in violation of the IGP.

**E.    Defendant Has Failed to Develop, Implement, and/or Revise Adequate Monitoring Implementation Plan at the Robertson's Facility.**

183.    Plaintiffs are informed, believe, and thereon allege that Defendant has conducted and continues to conduct operations at the Facility with an inadequately developed, implemented, and/or revised MIP.

184.    Plaintiffs are informed, believe, and thereon allege that Defendant has failed and continues to fail to develop and/or implement a MIP that ensures the collection of storm water samples from all discharge locations at the Facility in violation of Section XI.B.4 of the 2015 and 2020 Permits.

185.    Section XI.B.4 of the 2015 and 2020 Permits specifically require dischargers to collect samples "from each drainage area at all discharge locations."

186.   The 2015 SWPPP reports the Facility has three storm water drainage areas, but claims that no industrial activities occur in DA2 or DA3, and thus Defendant has never collected samples from these drainage areas. 2015 SWPPP § 4.1.

187.   The 2019 NOV states establishes that, based on photos and observations during the February 2, 2019 site inspection, industrial activity does occur in DA2.

188.   DA2 and DA3 are the only ingress and egress points of the Facility, and therefore both are "immediate access roads" through which mixing trucks and hauling vehicles carrying aggregate, fly ash, cement, concrete and waste product regularly traverse.

189.   Section XVII.B.2 of the 2015 Permit states that industrial materials and activities "includes, but is not limited to, industrial material handling activities or equipment, machinery, raw materials, intermediate products, by-products, final products, and waste products."

190.   "If a stormwater discharge is associated with any of these activities, the discharger must obtain a permit and monitor the discharge." *Puget Soundkeeper Alliance v. Rainier Petroleum Corporation*, 2015 WL 13655379, at *9 (W.D. Wash. 2015).

191.   The Facility handles fly ash and cement, which are pervasive throughout the site, including the driveways in DA2 and DA3. 2020 SWPPP § 6.3; Table 3.

192.   "Industrial activities" include the movement of mobile equipment, which tracks pollutants, including fly ash and cement dust, throughout the Facility and off the Facility via the driveways in DA2 and DA3.

193.   The track out of pollutants is so extensive that Defendant contracts a street sweeper to clean Simpson Way, outside the Facility's boundaries.

194.   The 2015 SWPPP acknowledges, "[c]ement dust is very fine and it is difficult to sweep up to a level that does not adversely impact storm water." 2015 SWPPP § 7.0. The 2020 SWPPP contains similar admissions.

195.   Members of CERF and San Diego Coastkeeper personally observed discharges from the Facility driveways at DA3/OF3 on April 10, 2020 during a large rain

event, and at DA2/OF2 on March 10, 2020 during a smaller rain event. No samples were taken.

196.   On July 17, 2020, CERF and San Diego Coastkeeper representatives personally observed sediment track out from the Robertson's driveway to Simpson Way.

197.   Plaintiffs are informed, believe, and thereon allege the ingress and egress driveways in DA2 and DA3 of the Facility are areas of industrial activity which are regulated by the IGP, and which contribute pollutants to storm water discharged from the Facility.

198.   Plaintiffs are informed, believe, and thereon allege that by inaccurately classifying DA2 and DA3 as non-industrial areas, Defendant has violated and continues to violate the IGP for failing to collect samples from these drainage areas.

199.   Plaintiffs are informed, believe, and thereon allege the 2020 SWPPP improperly designates the discharges of DA2 and DA3 for representative sampling and qualified combined sampling. On information and belief, DA2 and DA3 do not have similar BMPs and similar activities do not occur at both locations. Therefore, DA2 and DA3 do not meet the IGP criteria for representative sampling reduction or for qualified combined sampling.

200.   Plaintiffs are informed, believe, and thereon allege Defendant failed and continues to fail to collect the required number of storm water samples for each reporting period.

201.   While the IGP requires Permittees within a Compliance Group to collect two samples each reporting period, the Facility has failed to collect any storm water samples during the 2015–2016, 2016–2017, and 2017–2018 reporting periods, and only collected one sample during the 2018–2019 reporting period despite the occurrence of numerous QSEs during these time periods. *See* Ex. 1.

202.   The Facility discharged milky, muddy, discolored water on December 12, 2018, following a storm. Defendant failed to collect any samples from these discharges.

203.   The 2019 NOV cites the Facility's failure to collect the required number of

storm water samples, further explaining that other QSEs had recently occurred that more than likely would have caused a discharge.

204.    Plaintiffs are informed, believe, and thereon allege the total retention capacity of the Facility is modest compared to footprint of the Facility's impervious surfaces. As a result of this limited retention capacity, Plaintiffs are informed, believe, and thereon allege the Facility frequently discharges from DA1.

205.    Plaintiffs are informed, believe, and thereon allege that the Facility regularly discharges from DA2 and DA3.

206.    Plaintiffs are informed, believe, and thereon allege Defendant has failed and continues to fail to sample and analyze storm water discharges for all parameters required by the IGP. The Facility analyzes its storm water samples for only TSS, O&G, pH, and iron.

207.    The Robertson's Facility does not comply with Sections XI.B.6.c–d of the 2015 and 2020 Permits, which requires permittees to analyze samples for all pollutants associated with the Discharger's industrial activities.

208.    The 2015 and 2020 Permits require Facility Owners and/or Operators to sample and analyze parameters on a Facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment. 2015 & 2020 Permit § XI.B.6.c.

209.    The Facility's pollutant source assessment is deficient and in violation of the Permit as numerous pollutants such as mercury, copper, chromium, hexavalent chromium, cadmium, nickel, manganese, lead, arsenic, zinc, aluminum, selenium, nitrogen, and phosphorus are likely present at the Facility and associated with its industrial activities. As a result, Defendant's failure to analyze samples for these parameters violates the IGP.

210.    Defendant has also failed to comply with the IGP's requirements for sample holding times and sample handling procedures.

211.    The samples collected on February 5, 2019 "were not received by the lab

until February 12, 2019 and the holding time of 7 [sic] days was exceeded for the approved test method (SM 2450-D)" for TSS in violation of the Permit. 2019 NOV; *see also* 2015 & 2020 Permit § XI.B.10.

212.   The samples from February 5, 2019, and March 13, 2020 were not received by the laboratory within 48 hours, as required by Section XI.B.8 of the 2015 and 2020 Permits.

213.   Plaintiffs are informed, believe, and thereon allege Defendant failed to follow the IGP's requirement to ensure the collection, preservation and handling of all storm water samples is in accordance with Attachment H of the Permit. 2015 & 2020 Permit §XI.B.8.

214.   Specifically, for the February 5, 2019, December 7, 2019, and March 13, 2020 sampling events, the sample container was missing a label. *See* 2015 Permit Attachment H, ¶12.

215.   All of these samples were also improperly preserved – none of them were put on ice and all were well above 4 degrees Celsius, ensuring sample results would be unreliable. *See*, Permit Attachment H, ¶13.

216.   Complete preservation of samples is a practical impossibility. Regardless of the sample nature, complete stability for every constituent can never be fully attained. At best, sample preservation only slows the biological and chemical changes that continue after the sample is collected. Methods of preservation are intended to retard biological action and hydrolysis of chemical compounds and complexes and reduce volatility of constituents. To minimize the potential for volatilization or biodegradation between sampling and analysis, samples must be kept as cool as possible without freezing.

217.   The IGP requires dischargers to conduct visual observations of storm water discharges, of authorized and unauthorized NSWDs, and of BMPs. Plaintiffs are informed, believe, and thereon allege, Defendant fails to consistently, and/or adequately, conduct the required discharge observations and monitoring of BMPs.

**F.   Defendant Has Violated the IGP's Reporting Requirements.**

218.   Defendant has failed and continues to fail to submit Annual Reports that comply with the IGP reporting requirements.

219.   The Facility's 2015–2016, 2016–2017, 2017–2018, and 2018–2019 Annual Reports claim that the Facility failed to collect the requisite number of storm water samples due to a lack of qualifying discharges during business hours.

220.   The 2018–2019 Annual Report claims that "[n]o qualifying storm water discharges occurred during the first half of the reporting year."

221.   This claim is directly contradicted by the City of Escondido inspection reports and photos.

222.   The Facility failed to collect a storm water sample prior to February 5, 2019 though precipitation data indicates that numerous QSE's and sequential storm events occurred in the years prior to this date.

223.   In light of the foregoing, Plaintiffs are informed, believe, and thereon allege the Defendant has falsified information on numerous Annual Reports.

224.   In each Annual Report since the filing of the 2015–16 Annual Report, Defendant certifies that: (1) a complete Annual Comprehensive Site Compliance Evaluation was conducted as required by the IGP; (2) the SWPPP's BMPs address existing potential pollutant sources; and (3) the SWPPP complies with the IGP, or will otherwise be revised to achieve compliance.

225.   Plaintiffs are informed, believe, and thereon allege these certifications are erroneous. For example, Safety Director Andrew Arthur certified the 2018–2019 Annual Report which states "no qualifying storm water discharges occurred during the first half of the reporting year."

226.   Plaintiffs are informed, believe, and thereon allege the 2018–2019 Annual Report certification is erroneous, and Mr. Arthur knew or should have known that the assertion that no QSEs occurred during this time period was false.

227.   Plaintiffs are informed, believe, and thereon allege the Facility's SWPPPs do not include many elements required by the IGP, and Defendant's certification to the

1  contrary constitutes a violation of the IGP and CWA.

2  228.   Facility operators must report any noncompliance with the IGP at the time

3  that the Annual Report is submitted, including (1) a description of the noncompliance and

4  its cause, (2) the period of noncompliance, (3) if the noncompliance has not been

5  corrected, the anticipated time it is expected to continue, and (4) steps taken or planned to

6  reduce and prevent recurrence of the noncompliance. 1997 Permit, § C.11.d; 2015 &

7  2020 Permit, § XVI.B.2.

8  229.   Plaintiffs are informed, believe, and thereon allege that Defendant has failed

9  to report numerous instances of non-compliance required by the IGP.

10  **V.      CLAIMS FOR RELIEF**

11  **FIRST CAUSE OF ACTION**

12  **Discharges of Contaminated Storm Water in Violation of the IGP's**
    **Discharge Prohibitions and the Clean Water Act.**

13  **33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

14

15  230.   Plaintiffs incorporate the allegations contained in the above paragraphs as

16  though fully set forth herein.

17  231.   Plaintiffs are informed and believe, and thereon allege that prohibited non-

18  storm water discharges have and continue to discharge from the Facility. Defendant's

19  ongoing failure to prevent unauthorized non-storm water discharges is a violation of the

20  IGP and the CWA. 1997 Permit § A.1; 2015 & 2020 Permit § III.B; 33 U.S.C. § 1311(a).

21  232.   Defendant violated and will continue to violate the IGP Discharge

22  Prohibition each and every time unauthorized non-storm water discharges from the

23  Facility.

24  233.   Plaintiffs are informed and believe, and thereon allege that Defendant has

25  discharged and continues to discharge numerous pollutants in concentrations that cause

26  or threaten to cause pollution, contamination, or nuisance in and around Receiving

27  Waters in violation of Section A.2 of the 1997 Permit, and Section III.C of the 2015 and

28  2020 Permits.

234.   Plaintiffs are informed and believe, and thereon allege that Defendant has discharged and continues to discharge numerous pollutants in excess of water quality objectives listed in the Basin Plan in violation of Section III.D of the 2015 and 2020 Permits.

235.   Plaintiffs are informed and believe, and thereon allege that Defendant has been in violation of the IGP Discharge Prohibition at the Facility every day from June 4, 2015 to the present. Plaintiffs are informed and believe, and thereon allege that Defendant's violations of the IGP Discharge Prohibitions are ongoing and continuous.

236.   Each and every violation of the IGP Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from June 4, 2015 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SECOND CAUSE OF ACTION

### Discharges of Contaminated Storm Water in Violation of the IGP's Effluent Limitations and the Clean Water Act.

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

237.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

238.   Plaintiffs are informed, believe, and thereon allege Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities from discharging through implementation of BMPs that achieve BAT/BCT at the Facility.

239.   Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards occur every time storm water discharges from the Facility.

240.   Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of

the IGP and the CWA. *See* 1997 Permit § B.3; 2015 Permit § I.D.32, V.A; 2020 Permit § V.A; *see also* 33 U.S.C. § 1311(b).

241.   Defendant violated and continues to violate the IGP Effluent Limitation each time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharge from the Facility.

242.   Plaintiffs are informed and believe, and thereon allege, that Defendant has been in violation of the IGP Effluent Limitation at the Facility every day from June 4, 2015, to the present. Plaintiffs are informed, believe, and thereon allege Defendant's violations of the IGP Effluent Limitation and the CWA are ongoing and continuous. Defendant will continue to be in violation of the IGP and the CWA each day it fails to adequately develop and/or implement BMPs to achieve BAT/BCT at the Facility.

243.   Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

244.   Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that comply with Effluent Limitations in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA occurring since June 4, 2015. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

### THIRD CAUSE OF ACTION
**Discharges of Contaminated Storm Water in Violation of IGP Receiving Water Limitations and the Clean Water Act.**
### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

245.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

246.   Plaintiffs are informed and believe, and thereon allege, that the Facility discharges storm water containing levels of pollutants that adversely impact human health and/or the environment.

247.   Plaintiffs are informed and believe, and thereon allege, that Defendant discharges storm water containing levels of pollutants that cause or contribute to exceedances of WQSs from the Facility.

248.   Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment occur each time storm water discharges from the Facility.

249.   Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that cause or contribute to exceedances of WQSs occur each time storm water discharges from the Facility.

250.   Defendant's discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs, are violations of the IGP and the Clean Water Act. 1997 Permit §§ C.1–2; 2015 & 2020 Permit §§ VI.A–B; 33 U.S.C. § 1311(b).

251.   Plaintiffs are informed, believe, and thereon allege Defendant violated and will continue to violate the IGP Receiving Water Limitations every time storm water containing levels of pollutants that adversely impact human health or the environment, or that cause or contribute to exceedances of WQSs discharge from the Facility.

252.   Plaintiffs are informed, believe, and thereon allege Defendant's violations of the IGP Receiving Water Limitations and the CWA are ongoing and continuous.

253.   Defendant will continue to be in violation of the IGP and the CWA each time storm water containing levels of pollutants that adversely impact human health or the environment, or that causes or contributes to exceedances of WQSs is discharged from the Facility.

254.   Each day that Defendant has discharged and/or continues to discharge polluted storm water from the Facility in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

255.   Plaintiffs are informed, believe, and thereon allege Defendant has been in violation of the IGP Receiving Water Limitations every day since June 4, 2015. By

committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA since June 4, 2015. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

### FOURTH CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and/or Revise the Facility's Storm Water Pollution Prevention Plans in Violation of the IGP and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

256.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

257.    Defendant has failed and continues to fail to develop and/or implement adequate SWPPPs for the Facility.

258.    Defendant has failed and continues to fail to adequately revise the SWPPP for the Facility.

259.    Defendant conducts operations at the Facility each day without an adequately developed, implemented, and/or revised SWPPP. Defendant's failure to adequately develop, implement, and/or revise SWPPPs for the Facility is a violation of the IGP and the Clean Water Act. *See* 1997 Permit § A; 2015 & 2020 Permit § X; *see also* 33 U.S.C. § 1311(b).

260.    Defendant has been in violation of the IGP SWPPP requirements at the Facility every day from June 4, 2015, to the present. Defendant's violations of the IGP SWPPP requirements and the CWA at the Facility are ongoing and continuous.

261.    Defendant will continue to be in violation of the IGP and the CWA each day it fails to adequately develop, implement, and revise the Facility SWPPP.

262.    Each day Defendant operates the Facility without developing and/or implementing an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. §1311(a). By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA occurring since June 4, 2015. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## FIFTH CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and Revise Adequate Monitoring Implementation Plan in Violation of the IGP and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

263.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

264.   Defendant has failed and continues to fail to develop and/or implement an adequate MIP for the Facility. Defendant operates the Facility each day without an adequately developed, implemented, and/or revised MIP.

265.   Defendant's failure to adequately develop, implement, and/or revise the MIP for the Facility is a violation of the IGP and the Clean Water Act. *See* 1997 Permit § B; 2015 & 2020 Permit § XI; *see also* 33 U.S.C. § 1311(b).

266.   Defendant has been in violation of the IGP MIP requirements every day from June 4, 2015, to the present. Defendant's violations of the IGP MIP requirements and the CWA at the Facility are ongoing and continuous.

267.   Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to adequately develop, implement, and/or revise the Facility MIP.

268.   Each day that Defendant operates the Facility without developing, implementing, and/or revising an adequate MIP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since June 4, 2015. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SIXTH CAUSE OF ACTION

**Failure to Report as Required in Violation of the IGP and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

269.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

270.   Plaintiffs are informed and believe, and thereon allege Defendant has failed and continues to fail to submit accurate and/or complete Annual Reports for the Facility.

271.   The Defendant's failure to submit complete and accurate Annual Reports is a violation of the IGP and the Clean Water Act. *See* 1997 Permit §§ B.14, C.9–10; 2015 & 2020 Permit § XVI; *see also* 33 U.S.C. § 1311(b).

272.   Defendant conducts operations at the Facility each day without reporting as required by the IGP. Defendant has been in violation of the IGP's reporting requirements every day since at least June 4, 2015. Defendant's violations of the reporting requirements of the IGP and the CWA are ongoing and continuous.

273.   Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to comply with the IGP reporting requirements at the Facility.

274.   Each and every violation of the IGP reporting requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since June 4, 2015. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SEVENTH CAUSE OF ACTION

### Failure to Properly Monitor in Violation of the IGP.
### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

275.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

276.   Plaintiffs are informed and believe, and thereon allege, that Defendant has failed and continues to fail to conduct the requisite visual observations of storm water discharges at the Facility. Defendant's failure to conduct the requisite visual observations at the Facility is a violation of the IGP and the CWA. *See* 1997 Permit §§ B.3–4; 2015 & 2020 Permit § XI.A; *see also* 33 U.S.C. § 1311(b).

277.   Defendant has failed to collect and analyze the required number of storm water samples the Facility. Defendant's failure to collect and analyze the required

number of storm water samples at the Facility is a violation of the IGP and the CWA. 1997 Permit §§ B.5.a–b, 2015 Permit & 2020 Permit §§ XI.B.1–3; 33 U.S.C. § 1311(b).

278.   Defendant has failed and continues to fail to analyze all collected samples for all required parameters in violation of the IGP and the CWA. *See* 1997 Permit §§ B.5.c, B.6; 2015 & 2020 Permit § XI; *see also* 33 U.S.C. § 1311(b).

279.   Plaintiffs are informed and believe, and thereon allege, that Defendant has failed and continues to fail to comply with the IGP's monitoring requirements at the Facility since June 4, 2015. Defendant's violations of the IGP monitoring requirements and the Clean Water Act are ongoing and continuous.

280.   Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to comply with the IGP's monitoring requirements.

281.   Each and every violation of the IGP's monitoring requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since June 4, 2015. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## VI.   <u>RELIEF REQUESTED</u>

282.   Plaintiffs respectfully request that this Court grant the following relief:

a.   A court order declaring the Defendant to have violated and to be in violation of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to comply with discharge prohibitions, effluent limitations which include BAT/BCT requirements, and receiving water limitations, and for failing to comply with the other substantive and procedural requirements of the IGP as set forth within this Complaint;

b.   A court order enjoining Defendant from discharging pollutants from the Facility to surface waters in violation of the Clean Water Act and IGP;

c.   A court order requiring Defendant to implement affirmative injunctive

measures designed to eliminate Defendant's violations of the substantive and procedural requirements of the IGP and the Clean Water Act;

   d. A court order assessing civil monetary penalties for each violation of the CWA at $37,500.00 per day per violation for all CWA violations after January 12, 2009, and $55,800.00 per day per violation for violations that occurred after November 2, 2015, as permitted by CWA Section 309(d), 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, and 40 C.F.R. § 19.4.

   e. A court order awarding Plaintiffs their reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

   f. Any other relief as this Court may deem appropriate.

Dated: August 12, 2020

            Respectfully submitted,

            COAST LAW GROUP LLP
            By: s/Livia B. Beaudin
            LIVIA B. BEAUDIN
            Attorney for Plaintiffs
            COASTAL ENVIRONMENTAL
            RIGHTS FOUNDATION
            E-mail: livia@coastlawgroup.com

            SAN DIEGO COASTKEEPER
            By: s/Matt O'Malley
            MATT O'MALLEY
            Attorney for Plaintiffs
            SAN DIEGO COASTKEEPER
            E-mail: matt@sdcoastkeeper.org

 

June 4, 2020

<u>VIA CERTIFIED MAIL - RETURN RECEIPT REQUESTED</u>

Jack Myers                                          Mervyn Encarnacion
Duly Authorized Representative                      Agent for Service of Process
Robertson's Ready Mix                              Robertson's Ready Mix, Ltd.
1310 Simpson Way                                   200 S. Main Street, Suite 200
Escondido, CA 92029                                Corona, CA 92882

Andrew Arthur
Legally Responsible Person
Robertson's Ready Mix
P.O. Box 3600
Corona, CA 92872

      **Re:    Notice of Violation and Intent to File Suit Under the Clean Water Act**

To the Above-Listed Recipient:

      Please accept this letter on behalf of San Diego Coastkeeper ("Coastkeeper") and Coastal Environmental Rights Foundation ("CERF") regarding violations of the Clean Water Act[1] and California's General Permit for Storm Water Discharges Associated with Industrial Activities[2] occurring at the Robertson's Ready Mix Escondido batch plant, located at 1310 Simpson Way, Escondido, California, 92029 ("Robertson's Facility" or "Facility"). The purpose of this letter is to put Robertson's Ready Mix, as the owner(s) and/or operator(s) of the Facility, on notice of the violations of the Industrial General Permit occurring at the Facility, including, but not limited to, discharges of polluted storm water from the Robertson's Facility into local surface waters. Violations of the Industrial General Permit are violations of the Clean Water Act. As explained below, Robertson's Ready Mix is liable for violations of the Industrial General Permit and the Clean Water Act.

      Section 505(b) of the Clean Water Act, 33 U.S.C. § 1365(b), requires that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a), a citizen must give notice of his/her intention to file suit. Notice must be given to the alleged violator, the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA, the Executive Officer of the water pollution control agency in the State in which the violations occur, and, if the alleged violator is a

---

[1] Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq*.
[2] National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, Order No. 97-03-DWQ ("1997 Permit"), as amended by Order No. 2014-0057-DWQ ("2015 Permit") [hereinafter "Industrial General Permit"].

corporation, the registered agent of the corporation. *See* 40 C.F.R. § 135.2(a)(1). This notice letter ("Notice Letter") is being sent to you as the responsible owner and/or operator of the Robertson's Facility, or as the registered agent for the owner and/or operator. This Notice Letter is issued pursuant to 33 U.S.C. §§ 1365(a) and (b) of the Clean Water Act to inform Robertson's Ready Mix that Coastkeeper and CERF intend to file a federal enforcement action against Robertson's Ready Mix for violations of the Industrial General Permit and the Clean Water Act sixty (60) days from the date of this Notice Letter.

## 1.    BACKGROUND

### 1.1. <u>San Diego Coastkeeper and Coastal Environmental Rights Foundation</u>.

San Diego Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its office at 2825 Dewey Road, Suite 207, San Diego, California 92106. Its telephone number is 619-758-7743. Founded in 1995, San Diego Coastkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of San Diego County watersheds. To further these goals, Coastkeeper actively seeks federal and state agency implementation of the Clean Water Act, and, where necessary, directly initiates enforcement actions on behalf of themselves and their members.

CERF is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Encinitas, California. CERF is dedicated to the preservation, protection, and defense of the environment, the wildlife, and the natural resources of the California Coast. CERF's mailing address is 1140 S. Coast Highway 101, Encinitas, California 92024. CERF may be reached at 760-942-8505.

Members of Coastkeeper and CERF live in and around, recreate in and around, and enjoy the waters into which the Facility discharges, including Escondido Creek, the San Elijo Lagoon, and the Pacific Ocean (collectively "Receiving Waters"). Members of Coastkeeper and CERF use the Receiving Waters to swim, boat, kayak, surf, fish, bird watch, view wildlife, hike, bike, walk, run, and/or for general aesthetic enjoyment. Additionally, members of Coastkeeper and CERF use the Receiving Waters to engage in scientific study through pollution and habitat monitoring and restoration activities. The discharges of pollutants from the Facility impair each of these uses. Discharges of polluted storm water from the Facility are ongoing and continuous. Thus, the interests of Coastkeeper's and CERF's members have been, are being, and will continue to be adversely affected by the Facility Owner and/or Operator's failure to comply with the Clean Water Act and the Industrial General Permit.

### 1.2. <u>The Owner and/or Operator of the Facility</u>.

Information available to Coastkeeper and CERF indicates that Robertson's Ready Mix is the owner and/or operator of the Facility and has been for at least the past five years. Information available to Coastkeeper and CERF indicates that Robertson's Ready Mix, Ltd. is an active California corporation with its principal executive offices located 200 S. Main St., Suite 200,

Notice of Intent to Sue: Clean Water Act
*Robertson's Ready Mix, Escondido Facility*
June 4, 2020
Page 3

Corona, CA 92882, and its Agent for Service of Process is Mervyn Encarnacion, also located at 200 S. Main Street, Suite 200, Corona, CA 92882.

The Robertson's Facility Owner and/or Operator has violated and continues to violate the procedural and substantive terms of the Industrial General Permit including, but not limited to, the illegal discharge of pollutants from the Facility into local surface waters. As explained herein, the Facility Owner and/or Operator is liable for violations of the Industrial General Permit and the Clean Water Act.

### 1.3. <u>The Facility's Industrial General Permit Coverage</u>.

Certain classified facilities that discharge storm water associated with industrial activity are required to apply for coverage under the Industrial General Permit by submitting a Notice of Intent ("NOI") to the State Water Resources Control Board ("State Board") to obtain Industrial General Permit coverage.[3] Information available to Coastkeeper and CERF indicates the Robertson's Facility first obtained Industrial General Permit coverage on November 14, 2011. The Facility submitted its most recent NOI on January 12, 2018 ("2018 NOI"). Coastkeeper and CERF obtained the 2018 NOI from California's online Storm Water Multiple Application & Reporting Tracking System ("SMARTs") database. The 2018 NOI lists the Facility Waste Discharge Identification ("WDID") number as 9 37I023400, and identifies both the Facility site name as "Robertsons Escondid [sic] Batch Plant," and the Facility operator as "Robertsons [sic] Ready Mix."

The 2018 NOI states that the Facility is 2.02 acres, one acre of which is exposed to storm water, and omits the percentage of the site that is impervious. The Facility's Storm Water Pollution Prevention Plan ("SWPPP") dated May 2015, states that the Facility is 2.02 acres, and that the site is approximately one hundred percent impervious.

Both the 2018 NOI and the 2015 SWPPP list the Facility's Standard Industrial Classification ("SIC") code as 3273 (ready-mixed concrete). Coastkeeper and CERF put the Facility Owner and/or Operator on notice that industrial activities are conducted, and pollutants associated with these industrial activities are present, throughout the Facility, and thus the entire Facility requires Industrial General Permit coverage. In addition, the Industrial General Permit's definition of "storm water associated with industrial activities," as well as the Permit's explanation of material handling activities, requires Permit coverage for all storm water from non-industrial sources that comingles with industrial storm water. Because the Facility lacks best management practices ("BMPs") or other controls to adequately separate industrial storm water flows from portions of the Facility where non-regulated activities may occur, some industrial storm water at the Facility commingles with storm water, and thus all storm water discharges from the Facility require coverage under the Industrial General Permit.

---

[3] *See* 2015 Permit, Attachment A.

### 1.4. <u>Storm Water Pollution and the Waters Receiving Facility's Discharges</u>.

With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations around San Diego County, such as the Robertson's Facility, pour into storm drains and local waterways. The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year. Such discharges of pollutants from industrial facilities contribute to the impairment of downstream waters and aquatic dependent wildlife. These contaminated discharges can and must be controlled for the ecosystem to regain its health.

According to the 2015 SWPPP, storm water discharges from the Facility enter the City of Escondido's storm water channels which run adjacent to the Facility on both the northern and eastern boundaries. These channels flow downstream to Escondido Creek, San Elijo Lagoon, and ultimately to the Pacific Ocean via the mouth of San Elijo lagoon at Cardiff State Beach. *See* 2015 SWPPP § 10.4.3.

The Receiving Waters into which the Robertson's Facility discharges polluted storm water are ecologically sensitive areas. Although pollution and habitat destruction have drastically diminished once-abundant and varied habitats along Escondido Creek and San Elijo Lagoon, both waterbodies still serve as the lifeblood for dozens of fish, bird, mammal, and reptile species. As ninety percent of California's coastal wetlands have been destroyed by urban development, San Elijo Lagoon is a critical remaining habitat. It serves as a hatchery for young fish and an important refuge for resident birds, as well as those migrating along the Pacific Flyway. "More than 40 percent of North American bird species have been sighted at San Elijo Lagoon, which serves as an important stopover."[4] Storm water and non-storm water contaminated with sediment, heavy metals, nutrients, and other pollutants discharged from the Robertson's Facility are deleterious to invertebrates, insects, larval fish, and local vegetation in Escondido Creek and the San Elijo Lagoon. As such, these pollutants degrade the special biological significance of the area and strain the ecosystems on which numerous species, many of which are categorized as endangered or sensitive, depend for survival. Such species include the Western Snowy Plover, the Least Tern, and the Southwestern Willow Flycatcher, all of which rely on the habitat provided by the San Elijo Lagoon.[5]

Polluted discharges from the Facility also harm the special aesthetic and recreational significance of the Receiving Waters, adversely impacting the public's ability, as well as that of Coastkeeper's and CERF's members, to use and enjoy these unique waterbodies. Members of the public, including members of Coastkeeper and CERF, enjoy picnicking, hiking, mountain biking, horseback riding, rock climbing, recreational fishing, subsistence fishing, bird watching, and aquatic activities such as surfing, swimming, paddle boarding, and kayaking in numerous

---

[4] *Map and Trail Guide*, SAN ELIJO LAGOON ECOLOGICAL RESERVE, http://www.sdparks.org/content/dam/sdparks/en/pdf/BrochuresMiscellaneous/SanElijoBrochure.pdf

[5] *Habitat Restoration*, NATURE COLLECTIVE, https://thenaturecollective.org/project/habitat-restoration/.

designated recreational areas in an around the Receiving Waters, which extend to the Pacific Ocean. For example, the Escondido Creek Trail is an urban pathway open to pedestrians and cyclists along the Creek within the City of Escondido. Escondido Creek also passes through the Elfin Forest Recreation Reserve, which is largely undeveloped and offers miles of hiking, mountain biking, and equestrian trails.[6] The San Elijo Ecological Reserve similarly offers trails for both nature observation, educational opportunities, and other recreational pursuits.[7] San Elijo Lagoon empties to the Pacific Ocean at Cardiff State Beach, in an area commonly crowded with beachgoers and people engaged in various contact recreation activities. Pollutants discharged from the Robertson's Facility affect the health of the Receiving Waters, which can affect human health, as well as the plant and animal life of the surrounding habitats. Damage to these natural habitats, and thus the flora and fauna within them, harms the ability of the public, including Coastkeeper's and CERF's members' ability, to use and enjoy these unique recreational opportunities. Furthermore, Coastkeeper's and CERF's members are deterred from, and thus less likely to, recreate in and around such waters that are known to be polluted with harmful toxic metals, excessive nutrients, and other pollutants.

The Regional Board issued the *Water Quality Control Plan for the San Diego Basin* ("San Diego Basin Plan" or "Basin Plan"), which identifies the "Beneficial Uses" of water bodies in the region. The Beneficial Uses for Escondido Creek downstream of the Robertson's Facility's point of discharge include: municipal and domestic supply; agricultural supply; potential industrial service supply; contact water recreation; non-contact water recreation; warm freshwater habitat; cold freshwater habitat; and wildlife habitat. Basin Plan, Table 2-2. The Beneficial Uses for the San Elijo Lagoon include: contact water recreation; non-contact water recreation; wildlife habitat; preservation of biological habitats of special significance; estuarine habitat; marine habitat; spawning, reproduction, and/or early development; migration of aquatic organisms; and rare, threatened, or endangered species. *Id.*, Table 2-3. The Beneficial Uses for the Pacific Ocean include: industrial service supply; navigation; contact water recreation; non-contact water recreation; commercial and sport fishing; wildlife habitat; preservation of biological habitats of special significance; marine habitat; migration of aquatic organism; spawning, reproduction, and/or early development; shell harvesting; aqua culture; and rare, threatened, or endangered species. *Id.*

According to the 2016 303(d) List of Impaired Water Bodies, Escondido Creek is impaired for benthic community effects, bifenthrin, DDT, indicator bacteria (such as enterococcus and E. coli), malathion, manganese, nitrogen, phosphate, selenium, sulfates, total dissolved solids, and toxicity. According to the 2016 303(d) List, the San Elijo Lagoon is impaired for eutrophic conditions, indicator bacteria, sedimentation/siltation, and toxicity. According to the 2016 303(d) List, the Pacific Ocean Shoreline, at Cardiff State Beach at San Elijo Lagoon is impaired for indicator bacteria. Polluted discharges from industrial sites, such as

---

[6] OLIVENHAIN MUN. WATER DIST., https://elfinforest.olivenhain.com/about/

[7] *See Map and Trail Guide*, SAN ELIJO LAGOON ECOLOGICAL RESERVE, http://www.sdparks.org/content/dam/sdparks/en/pdf/BrochuresMiscellaneous/SanElijoBrochure.pdf

the Robertson's Facility, contribute to the degradation of these already impaired surface waters and aquatic-dependent wildlife.

## 2.  THE ROBERTSON'S FACILITY AND RELATED DISCHARGES OF POLLUTANTS

### 2.1.  <u>The Facility Site Description and Industrial Activities</u>.

The Robertson's Escondido Batch Plant is an active concrete batch plant. 2015 SWPPP § 1.0. "Raw materials including aggregate (rock, sand, and gravel), cement fly ash, and admixtures are delivered to the site. These materials are mixed with water in a batch plant to create concrete," which is thereafter loaded into delivery trucks and shipped to customers. *Id*. Aggregate materials are transported to the batch plant via conveyor belts, which are exposed to storm water. *Id*. § 6.1.1; Regional Board Staff Enforcement Letter ("SEL"), Mar. 25, 2019. Cement and fly ash are transported from their respective storage silos to the batch plant via pipes. 2015 SWPPP § 6.1.1. The SWPPP further notes that the batch plant is not routinely cleaned, but the mixer trucks are washed in the concrete wash out area in the northwestern corner of the Facility to prevent accumulation of concrete. Excess concrete is removed from the mixer trucks and stored, allowed to dry, crushed by a mobile crushing unit at the Facility, and thereafter hauled offsite. *Id*. The Facility also engages in various ancillary support operations such as vehicle and equipment fueling and maintenance, and material storage. *Id*.

The 2015 SWPPP further acknowledges that the Facility Owner and/or Operator washes cement trucks in the concrete batch plant area. *Id*. This industrial activity generates waste water that collects in a shallow retention pond during normal operations. Information available to Coastkeeper and CERF, including a staff enforcement letter from the San Diego Regional Water Quality Control Board ("Regional Board") dated March 25, 2019, and a Notice of Violation ("NOV") issued by the Regional Board on July 17, 2019, indicates that waste water pools in this shallow basin where trucks and other vehicles frequently traverse. Vehicles thus track this waste water out of the basin and into other areas of the Facility.

The Facility SWPPP identifies numerous industrial materials that are stored, handled, and/or otherwise used at the facility, including: aggregate materials composed of rock, sand, and gravel; cement; fly ash; concrete admixtures; diesel fuel; lubricating oils such as motor oil, hydraulic oil, and transmission fluid; and other materials such as antifreeze, brake cleaner, grease, and battery acid. *Id*., §§ 5.0, 6.1.2; Table 1. Information available to Coastkeeper and CERF, including the SEL and NOV issued by the Regional Board, indicates that the Facility also handles and stores significant quantities of waste concrete material.

Information available to Coastkeeper and CERF indicates the aforementioned industrial activities occur, and industrial materials are handled, at various locations throughout the Facility either outdoors without adequate cover to prevent storm water and non-storm water exposure to pollutant sources, and/or without adequate secondary containment or other adequate treatment measures to prevent polluted storm water and non-storm water from discharging from the Facility. Further, many pollutants associated with industrial activities occurring indoors or under

partial shelter regularly escape via dust emissions, wind dispersion, vehicle track out, or otherwise, resulting in pollutant dispersal throughout the Facility. Information available to Coastkeeper and CERF indicates the pollutants associated with the Facility's industrial activities have been and continue to be tracked by vehicles and dispersed via wind throughout the entire site, and on and off the Facility through ingress and egress. This results in trucks and vehicles tracking pollutants off-site. The Robertson's Owner and/or Operator acknowledges this pollutant track out as they have stated they retain the services of a street sweeper to sweep Simpson Way multiple times per week. *See* City of Escondido inspection report, Apr. 16, 2018; Letter from Robertson's to Regional Board, Apr. 15, 2019. The resulting illegal discharges of polluted storm water and non-storm water impact Coastkeeper's and CERF's members' use and enjoyment of the Receiving Waters by degrading the quality of those waters, and by posing risks to human health, aquatic life, and ecosystem health.

### 2.2.  Pollutants and Pollutant Sources Related to the Facility's Industrial Activities.

The 2015 SWPPP acknowledges that the industrial activities of concrete production, mobile equipment operation, fueling and maintenance, hazardous material handling and storage, and dust and particulate generating activities can contribute pollutants to the Facility's storm water discharges. However, the SWPPP states that the only pollutants likely to be present in storm water discharges include oil and grease ("O&G"), iron, pH affecting substances, and total suspended solids ("TSS").

Information available to Coastkeeper and CERF indicates that numerous additional pollutants are present in the Facility's storm discharges. The 2015 SWPPP states that the industrial activities most likely to contribute pollutants to storm water and non-storm water are concrete production via spills and leaks of aggregate material, cement, fly ash, and returned concrete; mobile equipment operations via spills from equipment failure and fueling, and waste materials generation during maintenance activities; and hazardous material storage via spills from loading, unloading, storage, transfer, and use. 2015 SWPPP § 7.0. The Facility's concrete production activities also generate dust from loading aggregate, fly ash, and cement into mixing drums. *Id*. § 6.3. The 2015 SWPPP acknowledges that these dust and particulate generating activities can result in pollutant deposition within the Facility boundary, and can affect storm water pollution throughout the Facility. *Id*. Table 3. However, the 2015 SWPPP claims that these dust and particulate discharges result only in emissions of "natural crustal material," and that cement dust "may create high pH in water." *Id*. § 6.3.

Information available to Coastkeeper and CERF indicates that the Facility's concrete production activities result in high concentrations of numerous pollutants in the Facility's storm water discharges. It is well known that cement dust and fly ash are harmful, toxic, and carcinogenic. Fly ash can contain lead, arsenic, mercury, and cadmium.[8] Cement dust in the

---

[8] Dodge, Ed, *Can Coal Fly Ash Waste Be Put to Good Use?* (July 13, 2015), available at http://breakingenergy.com/2014/02/18/can-coal-fly-ash-waste-be-put-to-good-use/; U.S. EPA, *Coal Ash Basics*, available at https://www.epa.gov/coalash/coal-ash-basics; Physicians for Social Responsibility, *Coal Ash: Hazardous to Human Health*, available at https://www.psr.org/wp-

United States commonly contains mercury, copper, chromium, hexavalent cadmium, nickel, manganese, lead, and iron.[9] Many of these pollutants are considered toxic under the California Toxics Rule ("CTR"),[10] and all are regulated by the Industrial General Permit and Clean Water Act. Furthermore, the 2015 SWPPP admits that pollutants from cement dust is very difficult to control. "Cement dust is very fine and it is difficult to sweep up to a level that does not adversely impact storm water." 2015 SWPPP § 7.0.

Moreover, documents obtained from the San Diego Air Pollution Control District indicate that the Facility emits aluminum, arsenic, barium, beryllium, cadmium, cobalt, copper, lead, manganese, nickel, selenium, silica, and zinc as a result of its daily industrial activities. Additionally, Coastkeeper's and CERF's experience engaging with other similarly situated facilities, indicates that nitrogen and phosphorus are also commonly present in storm water discharges at ready mix concrete batch plants.

Information available to Coastkeeper and CERF indicates that spills and leaks of industrial materials further contribute to the Facility's storm water pollution. Although the 2015 SWPPP claims that the Facility has not experienced a spill or leak of industrial materials or hazardous substances in the past five years that had the potential to result in discharges from the Facility's storm water conveyance system, this is directly contradicted by copious evidence from the City of Escondido, the Regional Board, and the Facility Owner and/or Operator itself. 2015 SWPPP § 6.4. For example, the Regional Board's March 25, 2019 SEL includes multiple photos of industrial and waste material spills, as well as evidence of mobilization of these materials by storm water. Furthermore, in a letter dated April 15, 2019, Robertson's Ready-Mix itself explained that "[p]reventing all spills of materials at the Facility is simply not possible."

Information available to Coastkeeper and CERF indicates that process water, wash water, and other non-storm water at the Facility frequently commingle with storm water. For example, the Regional Board's March 25, 2019 SEL and July 17, 2019 NOV include photos and descriptions of process water commingling with storm water at the Facility. Specifically, the water used to wash trucks, as well as to wash pavement near the solid concrete waste piles, either flows into the storm water basin, or is tracked through various areas of the Facility and thus discharges with storm water.

In light of the foregoing, information available to Coastkeeper and CERF, including experience engaging with other similarly situated facilities, indicates that numerous additional pollutants associated with industrial activity are present in the Facility's storm water discharges,

---

content/uploads/2018/05/coal-ash-hazardous-to-human-health.pdf; University of Calgary, *Energy Education: Fly Ash*, available at
https://energyeducation.ca/encyclopedia/Fly_ash#cite_note-RE4-6
[9] Ogunbileje J.O., Sadagoparamanujam V.M., Anetor J.I., Farombi E.O., Akinosun O.M., Okorodudu A.O, *Lead, mercury, cadmium, chromium, nickel, copper, zinc, calcium, iron, manganese and chromium (VI) levels in Nigeria and United States of America cement dust*. CHEMOSPHERE, (Dec. 21, 2012), available at  https://www.ncbi.nlm.nih.gov/pubmed/23261125.
[10] 40 C.F.R. § 131.38.

including aluminum, arsenic, barium, beryllium, copper, chromium, hexavalent chromium, cadmium, cobalt, lead, nickel, manganese, mercury, zinc, selenium, nitrogen, and phosphorus.

### 2.3. <u>Robertson's Facility Storm Water Flow and Discharge Locations</u>.

The 2015 SWPPP states that the site has three drainage areas. Drainage Area 1 ("DA1") "consists of the central portion of the site and encompasses the entire property except for the driveways." 2015 SWPPP § 4.1. According to the 2015 SWPPP, "excessive storm water" within DA1 flows to a retention basin in the northeast corner of the Facility, the basin is "capable of containing a substantial amount of water, and discharge would only occur in extreme circumstances." *Id*. Upon overflow, water from the northeastern basin discharges to a City of Escondido storm water channel via Outfall 1 ("OF1").

Information available to Coastkeeper and CERF, including inspection photos and documents from the Regional Board and the City of Escondido, indicates that this basin overflows with much greater regularity than only "extreme circumstances." The Facility Owner and/or Operator has failed to state any specific capacity of the northeastern basin.

According to the 2015 SWPPP, "Drainage Area 2 ("DA2") consists of the west driveway, which serves as the facility exit." *Id*. Storm water from DA2 discharges directly to Simpson Way via Outfall 2. The 2015 SWPPP claims that "no industrial operations occur within DA2." *Id*. However, information available to Coastkeeper and CERF, as described in greater detail in Section 3.5.3, *infra*, indicates that industrial activities do occur within DA2.

According to the 2015 SWPPP, "Drainage Area 3 ("DA3") consists of the east driveway, which serves as the facility entrance." *Id*. Storm water from DA3 flows to a grate drain located on the east side of the driveway, which discharges directly to the adjacent City of Escondido storm water channel via Outfall 3. The 2015 SWPPP claims that "no industrial operations occur within DA3." *Id*. However, information available to Coastkeeper and CERF, as described in greater detail in Section 3.5.3, *infra*, indicates that industrial activities also occur within DA3.

## 3. VIOLATIONS OF THE CLEAN WATER ACT AND THE INDUSTRIAL GENERAL PERMIT

In California, any person who discharges storm water associated with certain industrial activity must comply with the terms of the Industrial General Permit in order to lawfully discharge pollutants. *See* 33 U.S.C. §§ 1311(a), 1342; 40 C.F.R. § 122.26(c)(1).

Between 1997 and June 30, 2015, the Industrial General Permit in effect was Order No. 97-03-DWQ, which Coastkeeper and CERF refer to as the "1997 Permit." On July 1, 2015, pursuant to Order No. 2014-0057-DWQ the Industrial General Permit was reissued, which Coastkeeper and CERF refer to as the "2015 Permit." As explained below, the 2015 Permit includes terms that are as stringent or more stringent than the 1997 Permit. Accordingly, the Robertson's Facility Owner and/or Operator is liable for violations of the 1997 Permit and ongoing violations of the 2015 Permit, and civil penalties and injunctive relief are available

remedies. *See Illinois v. Outboard Marine, Inc.*, 680 F.2d 473, 480–81 (7th Cir. 1982) (relief granted for violations of an expired permit); *Sierra Club v. Aluminum Co. of Am.*, 585 F. Supp. 842, 853–54 (N.D.N.Y. 1984) (holding that the Clean Water Act's legislative intent and public policy favor allowing penalties for violations of an expired permit); *Pub. Interest Research Group of N.J. v. Carter-Wallace, Inc.*, 684 F. Supp. 115, 121–22 (D.N.J. 1988) ("[l]imitations of an expired permit, when those limitations have been transferred unchanged to the newly issued permit, may be viewed as currently in effect").

### 3.1. Discharges of Polluted Storm Water from the Facility in Violation of Industrial General Permit Discharge Prohibitions.

The Industrial General Permit contains certain absolute prohibitions. "All discharges of storm water to waters of the United States are prohibited except as specifically authorized by this General Permit or another NPDES permit." 2015 Permit § III.A. The Discharge Prohibitions provisions prohibit the direct or indirect discharge of liquids or materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by a NPDES permit, to the waters of the United States. 1997 Permit § A.1; 2015 Permit § III.B.

Information available to Coastkeeper and CERF indicates the Robertson's Facility has discharged unauthorized non-storm water discharges ("NSWD") in violation of the Industrial General Permit. *See* 1997 Permit § A.1; 2015 Permit § III.B. For example, during a Regional Board inspection of the Facility conducted on February 6, 2019, the inspector observed that process water was allowed to commingle with industrial storm water. Regional Board NOV, Jul. 17, 2019. Robertson's staff described this water as wash water used on solid concrete waste piles and to wash down pavement. This process water drained through straw waddles, and into the Facility's northeastern retention basin. As stated by the Regional Board in the NOV, "[s]traw waddles are permeable and will not prevent industrial process water from commingling with storm water." *Id*. Robertson's staff further confirmed that the commingled water is stored onsite and discharges once the basin's containment capacity is exceeded. As such, the Robertson's Facility Owner and/or Operator has failed to develop and/or implement BMPs that would prevent these NSWD from comingling and/or discharging from the Facility in violation of the Industrial General Permit.

The Permit also prohibits storm water discharges and authorized NSWDs which cause or threaten to cause pollution, contamination, or nuisance as defined in Section 13050 of the California Water Code. 1997 Permit § A.2; 2015 Permit § III.C. The California Water Code defines "contamination" as "an impairment of the quality of the waters of the state by waste to a degree which creates a hazard to the public health through poisoning or through the spread of disease." "Pollution" is defined as "an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects . . . [t]he waters for beneficial uses."

Information available to Coastkeeper and CERF indicates the Robertson's Facility has discharged, and continues to discharge, numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters. For

Notice of Intent to Sue: Clean Water Act
*Robertson's Ready Mix, Escondido Facility*
June 4, 2020
Page 11

example, City of Escondido Environmental Programs inspections indicate that the Robertson's Facility illegally discharged a milky, muddy, discolored water into the storm drain channel. The City of Escondido ordered the Facility to cease such discharges, and to hire an environmental company to clean out the City's storm water channel to mitigate the pollution and contamination in the channel. As such, the Facility's discharges of polluted storm water have violated the Industrial General Permit's Discharge Prohibition III.C.

Section III.D of the 2015 Permit states that "[d]ischarges that violate any discharge prohibitions contained in applicable Regional Water Board Water Quality Control Plans (Basin Plans), or statewide water quality control plans and policies are prohibited." The San Diego Basin Plan designates beneficial uses for water bodies in the San Diego region and establishes water quality objectives and implementation plans to protect those beneficial uses.[11] The San Diego Basin Plan further establishes certain Waste Discharge Prohibitions.[12] Waste Discharge Prohibition number 5 of the San Diego Basin Plan states, "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives, is prohibited. Allowances for dilution may be made at the discretion of the Regional Board."[13] "Waste" is defined as, "waste substances, liquid, solid, gaseous, or radioactive, associated with human habitation, or of human or animal origin, or from any producing, manufacturing, or processing operation," which includes discharges of pollutants in storm water.[14] Accordingly, where the "quality of the discharge" does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the San Diego Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 Permit.

Information available to Coastkeeper and CERF, including its review of publicly available information and observations, indicates that no express allowance for dilution has been granted by the Regional Board applicable to the Robertson's Facility's discharges or to the downstream Receiving Waters. As such, information available to Coastkeeper and CERF, including inspection notes and photos from the City of Escondido and the Regional Board, and direct observations, indicates that the Robertson's Facility Owner and/or Operator has violated and continues to violate Discharge Prohibition III.D of the 2015 Permit by discharging pollutants in excess of water quality objectives listed in the San Diego Basin Plan and other "statewide water quality control plans," such as the CTR. As discussed further in Section 3.3, *infra*, Coastkeeper and CERF allege that the Facility has discharged storm water with concentrations of numerous pollutants in excess of the CTR standards and Basin Plan Water Quality Objectives in violation of the Industrial General Permit. The Facility Owner and/or Operator's failures to collect storm water samples in accordance with the Industrial General Permit and to analyze such samples for all required pollutants, as described further in Section 3.5.3 *infra*, do not excuse the Facility's violations of the Discharge Prohibitions provisions of the Industrial General Permit.

---

[11] *See* https://www.waterboards.ca.gov/sandiego/water_issues/programs/basin_plan/ for updated Basin Plan.
[12] San Diego Basin Plan, Chapter 4, page 4-19.
[13] *Id*. at page 4-20 (Waste Discharge Prohibition 5).
[14] California Water Code, § 13050(d) (emphasis added).

Case 3:20-cv-01565-WQH-MSB   Document 1   Filed 08/12/20   PageID.54   Page 54 of 72

Notice of Intent to Sue: Clean Water Act
*Robertson's Ready Mix, Escondido Facility*
June 4, 2020
Page 12

Coastkeeper and CERF put the Robertson's Facility Owner and/or Operator on notice that the Industrial General Permit Discharge Prohibitions are violated each time storm water discharges from the Facility. *See* Exhibit 1 (setting forth dates of all precipitation events during the past five years).[15] These Discharge Prohibition violations are ongoing and will continue every time the Facility Owner and/or Operator discharges polluted storm water in violation of Discharge Prohibitions III.B, III.C, or III.D of the 2015 Permit. Each time the Facility Owner and/or Operator discharges polluted storm water in violation of Discharge Prohibitions III.B, III.C, or III.D of the 2015 Permit is a separate and distinct violation of the Industrial General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owner and/or Operator has been in violation since June 4, 2015, and Coastkeeper and CERF will update the dates of violations when additional information and data become available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since June 4, 2015.

Further, Coastkeeper and CERF put the Robertson's Facility Owner and/or Operator on notice that Discharge Prohibitions III.B, III.C, and III.D are independent Industrial General Permit requirements that must be complied with, and that carrying out the iterative process triggered by exceedances of the Numeric Action Levels ("NALs") listed at Table 2 of the 2015 Permit does not amount to compliance with the Discharge Prohibition provisions.

### 3.2. Discharges of Polluted Storm Water from the Facility in Violation of Industrial General Permit Effluent Limitations.

The Industrial General Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through implementation of BMPs that achieve Best Available Technology Economically Achievable ("BAT") for toxic and non-conventional pollutants and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 1997 Permit § B.3; 2015 Permit § V.A.

The EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"). EPA Benchmarks are relevant and objective standards for evaluating whether a permittee's BMPs achieve compliance with BAT/BCT standards as required by Effluent Limitation B.3 of the 1997 Permit and Effluent Limitation V.A of the 2015 Permit.[16] As

---

[15] Exhibit 1 includes the dates of all precipitation events recorded during the past five years, and the corresponding quantity of precipitation for each such event. The data in Exhibit 1 was recorded by the National Oceanic & Atmospheric Administration at the weather monitoring station geographically nearest to the Facility with complete precipitation records. Coastkeeper and CERF will include additional dates of rain events when that information becomes available.

[16] *See United States Environmental Protection Agency (EPA) National Pollutant Discharge Elimination System (NPDES) Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (MSGP) Authorization to Discharge Under the National Pollutant Discharge Elimination System*, as modified effective February 26, 2009, Fact Sheet at 106; *see also* 65 Fed. Reg. 64839 (2000).

such, discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate that the Facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants.[17]

Information available to Coastkeeper and CERF, including its review of publicly available information and observations, indicates that BMPs that achieve BAT/BCT have not been developed and/or implemented at the Robertson's Facility. For example, the City of Escondido's inspection on December 12, 2018, responding to citizen complaints about visually noticeable discharges in the City's drainage channel, describing "milky/muddy discolored" discharges from the Facility indicates that the Facility BMPs failed to achieve BAT/BCT. These milky, discolored discharges also indicate that the Facility's discharges contained pollutants in concentrations exceeding EPA Benchmarks. However, the Facility failed to collect any samples from this discharge. Furthermore, the Regional Board's inspection on February 6, 2019 showing evidence of pollutant track out, industrial and waste material spills and mobilization by storm water, and commingling of process water and storm water, provides further evidence that the Facility's BMPs fail to achieve BAT/BCT, and further indicates that that the Facility has discharged, and continues to discharge pollutants in excess of EPA Benchmarks. Thus the Facility has violated and continues to violate the Effluent Limitations provisions of the Industrial General Permit.

Coastkeeper and CERF put the Robertson's Facility Owner and/or Operator on notice that the Industrial General Permit Effluent Limitations are violated each time storm water discharges from the Facility. *See* Ex. 1. These discharge violations are ongoing and will continue every time the Facility Owner and/or Operator discharges polluted storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards. Each time the Facility Owner and/or Operator discharges polluted storm water in violation of Effluent Limitation B.3 of the 1997 Permit and Effluent Limitation V.A of the 2015 Permit is a separate and distinct violation of the Industrial General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owner and/or Operator has been in violation since June 4, 2015, and Coastkeeper and CERF will update the dates of violations when additional information and data become available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since June 4, 2015.

Further, Coastkeeper and CERF put the Facility Owner and/or Operator on notice that the 2015 Permit Effluent Limitation V.A is an independent requirement that must be complied with, and that carrying out the iterative process triggered by exceedances of the NALs listed at Table 2 of the 2015 Permit does not amount to compliance with Effluent Limitation V.A.

### 3.3. <u>Discharges of Polluted Storm Water from the Facility in Violation of Industrial General Permit Receiving Water Limitations.</u>

Receiving Water Limitation C.2 of the 1997 Permit prohibits storm water discharges and authorized NSWDs that cause or contribute to an exceedance of an applicable Water Quality

---

[17] *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914 (C.D. Cal. 2009).

Standard ("WQS").[18] The 2015 Permit includes the same receiving water limitation. 2015 Permit § VI.A. The CTR and Basin Plan are applicable WQSs under the Industrial General Permit. Discharges that contain pollutants in excess of an applicable WQS violate the Industrial General Permit Receiving Water Limitations. 1997 Permit § C.2; 2015 Permit § VI.A.

Receiving Water Limitation C.1 of the 1997 Permit prohibits storm water discharges and authorized NSWDs to surface water that adversely impact human health or the environment. The 2015 Permit includes the same receiving water limitation. 2015 Permit § VI.B. Discharges that contain pollutants in concentrations that exceed levels known to adversely impact aquatic species and the environment constitute violations of the Industrial General Permit Receiving Water Limitation. 1997 Permit § C.1; 2015 Permit § VI.B.

Information available to Coastkeeper and CERF indicates the Facility discharges elevated concentrations of several toxic metals in excess of CTR standards. To begin, although the Facility Owner and/or Operator has failed to analyze storm water samples for all required parameters in violation of the Industrial General Permit, as discussed further in Section 3.5.3, *infra*, evidence indicates that the Facility regularly discharges commingled process water, wash water, and storm water containing numerous pollutants. For example, the Facility's milky, discolored discharges on December 12, 2018, as described in the City of Escondido inspection reports, indicates that storm water contaminated with materials or waste from the Facility's concrete production activities discharged from the Facility. While the Facility failed to collect any samples from these milky, discolored discharges, arsenic, mercury, copper, cadmium, nickel, lead, and hexavalent chromium, selenium, and zinc are all toxic metals which are associated with concrete production, as previously discussed in Section 2.2, *supra*. The 2015 SWPPP acknowledges that the dust and particulates generated during the production of concrete results in pollutant deposition within the Facility boundary, and can affect storm water pollution throughout the Facility. 2015 SWPPP § 6.3. The SWPPP also admits that pollutants from cement dust are very difficult to control, specifically noting that stating that "[c]ement dust is very fine and it is difficult to sweep up to a level that does not adversely impact storm water." 2015 SWPPP § 7.0. All of this strongly indicates that the Facility discharges elevated concentrations of several toxic metals in excess of CTR standards.

Receiving Waters downstream from the Facility are impaired, and thus unable to support the designated Beneficial Uses, for some of the same pollutants discharged by the Facility. Both Escondido Creek and the San Elijo Lagoon are impaired for toxicity. Arsenic, mercury, copper,

---

[18] The Basin Plan designates Beneficial Uses for the Receiving Waters. Water quality standards are pollutant concentration levels determined by the state or federal agencies to be protective of designated Beneficial Uses. Discharges above water quality standards contribute to the impairment of Receiving Waters' Beneficial Uses. Applicable water quality standards include, among others, the CTR standards and water quality objectives in the Basin Plan. Industrial storm water discharges must strictly comply with water quality standards, including those criteria listed in the applicable basin plan. *See Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166–67 (9th Cir. 1999).

cadmium, nickel, lead, and hexavalent chromium, selenium, and zinc are considered toxic
pollutants, and limitations on all such pollutant but for mercury are specifically enumerated in
the CTR. 40 C.F.R. § 131.38. The Facility's likely discharges of these toxic metals in excess of
the CTR standards cause and/or contribute to the toxicity impairment of Escondido Creek and
the San Elijo Lagoon. Thus, the Facility's storm water discharges in exceedance of WQSs,
causing and/or contributing to the impairments of Receiving Waters violates the Receiving
Water Limitations of the Industrial General Permit. *See* 1997 Permit § C.2; 2015 Permit § VI.A.

The milky, discolored discharges described by the December 12, 2018 City of Escondido
inspection also indicate the Facility discharges pollutants in exceedance of Basin Plan Water
Quality Objectives. The Basin Plan sets forth a narrative standard for TSS mandating that
"[w]aters shall not contain suspended and settleable solids in concentrations of solids that cause
nuisance or adversely affect beneficial uses." Milky, muddy, discolored discharges indicate high
concentrations of TSS. In fact, the appearance of these discharges was so alarming that the City
of Escondido immediately cited the Facility and ordered the Facility Owner and/or Operator to
clean their own discharges out of the storm water channel based only on the inspector's visual
observations.

According to the 2016 303(d) List of Impaired Water Bodies, Escondido Creek is
impaired for benthic community effects. The Basin Plan explains that "[s]uspended and
settleable solids are deleterious to benthic organisms and may cause the formation of anaerobic
conditions. They can clog fish gills and interfere with respiration in aquatic fauna. They also
screen out light, hindering photosynthesis and normal aquatic plant growth and development."
Basin Plan at 3-31. The Facility's storm water discharges containing elevated concentrations of
TSS in excess of the Basin Plan Water Quality Objective cause and/or contribute to the benthic
community effects impairments of Escondido Creek in violation of the Receiving Water
Limitations of the Industrial General Permit.

Escondido Creek is impaired – and thus unable to support these designated beneficial
uses – for some of the very pollutants likely found in the Facility's discharges, including
manganese, nitrogen, phosphorus, selenium, and total dissolved solids. Information available to
Coastkeeper and CERF indicates that the Facility's storm water discharges contain elevated
concentrations of these impairment-causing pollutants, such as nitrogen and phosphorus.
Phosphorus impacts the warm freshwater habitat beneficial use of Escondido Creek. Excess
concentrations of nutrients such as phosphorus and nitrogen can reduce levels of dissolved
oxygen and cause hypoxia or harmful algal blooms that can create toxins. Such toxins can move
up the food chain.[19] High nitrogen and phosphorus loadings also result in reduced spawning
grounds and nursery habitats, fish kills, and public health concerns related to impaired drinking
water sources and increased exposure to toxic microbes.[20]  The Creek is further impaired for
manganese, which also impacts the municipal & domestic supply beneficial use. The Facility's
storm water discharges containing elevated concentrations of nitrogen, phosphorus and
manganese in excess of the Basin Plan Water Quality Objective cause and/or contribute to the

---

[19] https://www.epa.gov/nutrientpollution/effects-environment
[20] https://www.epa.gov/sites/production/files/2014-08/documents/nutrient-memo-may252007.pdf

benthic community effects impairments of Escondido Creek in violation of the Receiving Water Limitations of the Industrial General Permit.

The CTR and Basin Plan are applicable WQSs under the Industrial General Permit. Thus, discharges from the Facility containing concentrations of pollutants in exceedance of WQSs, cause and/or contribute to the impairments of Receiving Waters in violation of Receiving Water Limitations of the Industrial General Permit. 1997 Permit § C.2; 2015 Permit § VI.A. Discharges of elevated concentrations of pollutants in the Facility's storm water also adversely impact human health. These harmful discharges from the Facility are also violations of the Industrial General Permit Receiving Water Limitations. *See* 1997 Permit § C.1; 2015 Permit § VI.B.

Coastkeeper and CERF put the Robertson's Facility Owner and/or Operator on notice that Industrial General Permit Receiving Water Limitations are violated each time polluted storm water discharges from the Facility. *See* Ex. 1. Each time discharges of storm water from the Facility cause and/or contribute to a violation of an applicable WQS, it is a separate and distinct violation of Receiving Water Limitation C.2 of the 1997 Permit, Receiving Water Limitation VI.A of the 2015 Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Each time discharges of storm water from the Facility adversely impact human health or the environment, it is a separate and distinct violation of Receiving Water Limitation C.1 of the 1997 Permit, Receiving Water Limitation VI.B of the 2015 Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). These discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the Industrial General Permit Receiving Water Limitations. The Facility Owner and/or Operator has been in violation since June 4, 2015, and Coastkeeper and CERF will update the dates of violation when additional information and data becomes available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since June 4, 2015.

Further, Coastkeeper and CERF put the Facility Owner and/or Operator on notice that Receiving Water Limitations are independent Industrial General Permit requirements that must be complied with, and that carrying out the iterative process triggered by exceedances of the NALs listed at Table 2 of the 2015 Permit does not amount to compliance with the Receiving Water Limitations.

### 3.4. <u>Failure to Develop, Implement, and/or Revise an Adequate Storm Water Pollution Prevention Plan</u>.

The Industrial General Permit requires permittees to develop and implement a Storm Water Pollution Prevention Plan prior to conducting industrial activities. A permittee has an ongoing obligation to revise the SWPPP as necessary to ensure compliance with the Industrial General Permit. The specific SWPPP requirements of the 1997 Permit and the 2015 Permit are set out below.

### 3.4.1.  1997 Permit SWPPP Requirements.

Section A.1 and Provision E.2 of the 1997 Permit require dischargers to have developed and implemented a SWPPP prior to beginning industrial activities that meets all of the requirements of the 1997 Permit. The objectives of the 1997 Permit SWPPP requirements are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges from the Facility and to implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water discharges. 1997 Permit § A.2. These BMPs must achieve compliance with the Industrial General Permit's Effluent Limitations and Receiving Water Limitations.

To ensure compliance with the Industrial General Permit, the SWPPP must be evaluated on an annual basis pursuant to the requirements of Section A.9 of the 1997 Permit, and must be revised as necessary to ensure compliance with the Industrial General Permit. 1997 Permit, Sections A.9–10. Sections A.3–10 of the 1997 Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a site map showing the Facility boundaries, storm water drainage areas with flow patterns, nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, areas of actual and potential pollutant contact, areas of industrial activity, and other features of the Facility and its industrial activities (§ A.4); a list of significant materials handled and stored at the site (§ A.5); a description of potential pollutant sources, including industrial processes, material handling and storage areas, dust and particulate generating activities, significant spills and leaks, NSWDs and their sources, and locations where soil erosion may occur (§ A.6).

Sections A.7–8 of the 1997 Permit require an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized NSWDs, including structural BMPs where non-structural BMPs are not effective.

### 3.4.2.  2015 Permit SWPPP Requirements.

As with the SWPPP requirements of the 1997 Permit, Sections X.A–H of the 2015 Permit require dischargers to have developed and implemented a SWPPP that meets all of the requirements of the 2015 Permit. *See also* 2015 Permit, Appendix 1. The objective of the SWPPP requirements are still to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, and to implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water discharges. 2015 Permit § X.C.

The SWPPP must include, among other things and consistent with the 1997 Permit, a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, points of discharge, direction of flow, areas of actual and potential pollutant contact, nearby water bodies, and pollutant control measures; a description of the BMPs developed and implemented to reduce or prevent pollutants in storm water discharges and authorized NSWDs necessary to comply with

the Industrial General Permit; the identification of NSWDs and the elimination of unauthorized NSWDs; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and the identification of individuals and their current responsibilities for developing and implementing the SWPPP. 2015 Permit §§ X.A–H.

Further, the 2015 Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Industrial General Permit. 2015 Permit §§ X.A–B. Like the 1997 Permit, the 2015 Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results; a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system; a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed; and a visual inspection of equipment needed to implement the SWPPP. 2015 Permit §§ X.B, XV.

### 3.4.3.   The Robertson's Facility Owner and/or Operator Has Violated and Continues to Violate the Industrial General Permit SWPPP Requirements.

The Facility Owner and/or Operator's site map and description of the Facility's drainage areas are inconsistent and/or inaccurate in violation of the Industrial General Permit. Section 4.0 of the 2015 SWPPP states that storm water within in DA1, which encompasses almost the entire Facility, flows to the northeastern retention basin. However, Section 1.0 of the SWPPP states that the batch plant is constructed in a shallow retention pond, and that waste water and wash water generated in this area flows into a sump and reclaimer system, which are all located within DA1. Neither the site map, nor the SWPPP delineate from which areas water flows to the larger northeastern basin, and which areas retain storm water within the shallow basin and sumps near the batch plant. These internal inconsistencies are a violation of the Permit, and further indicate that waste water from the concrete batch plant area commingles with storm water that flows to the northeast retention basin. The Facility Owner and/or Operator has also failed to upload an updated site map from April 2019 to the publicly available SMARTS database in violation of the Industrial General Permit.

The Robertson's Facility Owner and/or Operator has failed and continues to fail to develop and/or implement a SWPPP that contains BMPs to adequately prevent the exposure of pollutants to storm water, commingling of process and wash water with storm water, and the subsequent discharge of pollutants from the Facility, as required by the Industrial General Permit. The BMPs' inadequacies are documented by the multiple violations enumerated in the Regional Board's July 17, 2019 NOV. The NOV includes photos and descriptions of pollutant track out in violation of Section X.H.1.a.ii; failure to prohibit NSWDs in violation of Section III.B; failure to prevent the disposal of rinse and wash water into the storm water conveyance system in violation of Sections X.H.1.a.iv & vii; and numerous leaks and spills evidencing the Facility's failure to implement good housekeeping BMPs to prevent the disposal of industrial

materials and wastes into the storm water conveyance system in violation of Section X.H.1.a.vii of the 2015 Permit.

The Robertson's Facility Owner and/or Operator has failed and continues to fail to develop and/or implement a SWPPP that includes an adequate pollutant source assessment. Despite the SWPPP's acknowledgement of its industrial activities in operating a concrete batch plant, as well as the handling, tracking, and fugitive dust emissions from materials such as aggregate, fly ash, and cement dust, the 2015 SWPPP claims that the only pollutants present at the Facility associated with its industrial operations are TSS, O&G, pH, and iron. As discussed in Section 2.2, *supra*, numerous harmful, toxic, and carcinogenic pollutants are present in these materials, particularly in fly ash and cement dust. Fly ash can contain lead, arsenic, mercury, and cadmium.[21] Cement dust in the United States commonly contains mercury, copper, chromium, hexavalent chromium, cadmium, nickel, manganese, lead, and iron.[22] Moreover, documents obtained from the San Diego Air Pollution Control Board indicate that the Facility emits aluminum, arsenic, barium, beryllium, cadmium, cobalt, copper, lead, manganese, nickel, selenium, and zinc as a result of its daily industrial activities. The failure of the SWPPP to assess or acknowledge these pollutants is particularly egregious as many of these pollutants are considered toxic under the CTR, and all are regulated by the Industrial General Permit and Clean Water Act.

Accordingly, the Robertson's Facility Owner and/or Operator has failed and continues to fail to adequately develop, implement, and/or revise the Facility SWPPP in violation of the Industrial General Permit. Every day the Facility operates with an inadequately developed and/or implemented SWPPP, and/or with an improperly revised SWPPP is a separate and distinct violation of the Industrial General Permit and the Clean Water Act. The Facility Owner and/or Operator has been in daily and continuous violation of the Industrial General Permit SWPPP requirements since at least June 4, 2015. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since June 4, 2015.

---

[21] Dodge, Ed, *Can Coal Fly Ash Waste Be Put to Good Use?* (July 13, 2015), available at http://breakingenergy.com/2014/02/18/can-coal-fly-ash-waste-be-put-to-good-use/; U.S. EPA, *Coal Ash Basics*, available at https://www.epa.gov/coalash/coal-ash-basics; Physicians for Social Responsibility, *Coal Ash: Hazardous to Human Health*, available at https://www.psr.org/wp-content/uploads/2018/05/coal-ash-hazardous-to-human-health.pdf; University of Calgary, *Energy Education: Fly Ash*, available at https://energyeducation.ca/encyclopedia/Fly_ash#cite_note-RE4-6
[22] Ogunbileje J.O., Sadagoparamanujam V.M., Anetor J.I., Farombi E.O., Akinosun O.M., Okorodudu A.O, *Lead, mercury, cadmium, chromium, nickel, copper, zinc, calcium, iron, manganese and chromium (VI) levels in Nigeria and United States of America cement dust*. CHEMOSPHERE, (Dec. 21, 2012), available at  https://www.ncbi.nlm.nih.gov/pubmed/23261125.

### 3.5. <u>Failure to Develop, Implement, and/or Revise an Adequate Monitoring Implementation Plan</u>.

The Industrial General Permit requires permittees to develop and implement a storm water Monitoring Implementation Plan ("MIP") prior to conducting industrial activities. A permittee has an ongoing obligation to revise the MIP as necessary to ensure compliance with the Industrial General Permit. The specific MIP requirements of the 1997 Permit and the 2015 Permit are set out below.

#### 3.5.1.   <u>1997 Permit MIP Requirements</u>.

Section B.1 and Provision E.3 of the 1997 Permit require Facility operators to develop and implement an adequate MIP prior to the commencement of industrial activities at a Facility, that meets all of the requirements of the Industrial General Permit. The primary objective of the MIP is to detect and measure the concentrations of pollutants in a Facility's discharge to ensure compliance with the Industrial General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. *See* 1997 Permit § B2.

The MIP must therefore ensure that BMPs are effectively reducing and/or eliminating pollutants at the Facility, and must be evaluated and revised whenever appropriate to ensure compliance with the Industrial General Permit. *Id*. §§ B.3–16. Dischargers must revise the SWPPP in response to their MIP observations to ensure that BMPs are effectively reducing and/or eliminating pollutants at the Facility. *Id*. § B.4. Sections B.5 and B.7 of the 1997 Permit require dischargers to visually observe and collect samples of storm water from all locations where storm water is discharged.

Sections B.5 and B.7 of the 1997 Industrial General Permit require dischargers to visually observe and collect samples of storm water from all drainage areas and discharge locations where storm water is discharged. Under Section B.5 of the Industrial General Permit, a permittee is required to collect at least two (2) samples from each discharge location at the Facility during the Wet Season. Storm water samples must be analyzed for TSS, pH, specific conductivity ("SC"), total organic carbon or O&G, and other pollutants that are likely to be present in the Facility's discharges in significant quantities. *Id.* § B.5.c. Finally, permittees must identify and use analytical method detection limits sufficient to determine compliance with the 1997 Permit's monitoring program objectives and specifically, the Effluent Limitations and Receiving Water Limitations. *Id.* § B.10.iii.

#### 3.5.2.   <u>2015 Permit MIP Requirements</u>.

As with the 1997 MIP requirements, Sections X.I and XI.A–D of the 2015 Permit require Facility operators to develop and implement an adequate MIP that meets all of the requirements of the 2015 Permit. The objective of the MIP is still to detect and measure the concentrations of pollutants in a Facility's discharge, and to ensure compliance with the 2015 Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 2015 Permit § XI. An adequate MIP ensures that BMPs are effectively reducing and/or eliminating pollutants at the

Facility, and is evaluated and revised whenever appropriate to ensure compliance with the Industrial General Permit. *Id*.

As an *increase* in frequency of monitoring requirements, Sections XI.B.1–5 of the 2015 Permit requires permittees to collect storm water discharge samples from a qualifying storm event[23] as follows: (1) from each drainage area at all discharge locations, (2) from two (2) storm events within the first half of each Reporting Year[24] (July 1 to December 31), (3) from two (2) storm events within the second half of each Reporting Year (January 1 to June 30), and (4) within four hours of the start of a discharge, or the start of Facility operations if the qualifying storm event occurs within the previous 12-hour period. The 2015 Permit requires, among other things, that permittees must submit *all sampling* and analytical results for all samples via SMARTS within 30 days of obtaining all results for each sampling event. *Id*. § XI.B.11 (emphasis added).

The parameters to be analyzed are also consistent with the 1997 Permit, however, the 2015 Permit no longer requires SC to be analyzed. Sections XI.B.6.a–b of the 2015 Permit requires permittees to analyze samples for TSS, O&G, and pH. Section XI.B.6.c–d of the 2015 Permit requires permittees to analyze samples for all pollutants associated with the Discharger's industrial activities. Specifically, the 2015 Permit requires Facility Owners and/or Operators to sample and analyze parameters on a Facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment. *Id*. § XI.B.6.c. Section XI.B.6.e of the 2015 Permit also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with a Clean Water Act Section 303(d) listed impairment(s), or approved Total Maximum Daily Loads.

### 3.5.3.   The Facility Owner and/or Operator Has Violated and Continues to Violate the Industrial General Permit MIP Requirements.

The Robertson's Facility Owner and/or Operator has been and continues to conduct operations at the Facility with an inadequately developed, implemented, and/or revised MIP. First, the Robertson's Facility Owner and/or Operator has failed and continues to fail to develop and/or implement a MIP that requires the collection of storm water samples from all discharge locations at the Facility in violation of Section XI.B.4 of the 2015 Permit. Section XI.B.4 of the 2015 Permit specifically requires dischargers to collect samples "from *each drainage area* at *all* discharge locations" (emphasis added). While Section B.7.d of the 1997 Permit and Section XI.C.4 of the 2015 Permit allow permittees to reduce the number of locations to be sampled, there is no indication the Facility Owner and/or Operator has complied with the requirements of Section B.7.d of the 1997 Permit or Section XI.C.4 to justify sampling a reduced number of discharge locations at the Facility.

---

[23] The 2015 Permit defines a qualifying storm event as one that produces a discharge for at least one drainage area, and is preceded by 48-hours with no discharge from any drainage areas. 2015 Permit, § XI(B)(1).

[24] A Reporting Year replaced the 1997 permit term Wet Season, and is defined as July 1 through June 30. 2015 Permit, Findings, ¶ 62(b).

The Facility SWPPP reports the Facility has three storm water drainage areas, but claims that no industrial activities occur in DA2 or DA3, and thus the Facility Owner and/or Operator has never collected samples from these drainage areas. 2015 SWPPP § 4.1. However, the Regional Board's July 17, 2019 NOV states that based on photos and observations during the February 2, 2019 site inspection, industrial activity does occur in DA2. As stated in the NOV, industrial activity includes "storm water discharges from industrial plant yards; immediate access roads and rail lines used or traveled by carriers of raw materials; manufactured products, waste material, or by-products used or created by the facility." July 17, 2019 Regional Board NOV (*citing* 2015 Permit, Attachment C, Glossary, page 7); *see also* 40 C.F.R. § 122(b)(14) (defining areas of industrial activity to include "immediate access roads and rail lines used or traveled by carriers of raw materials, manufactured products, waste material, or by-products used or created by the facility"). As both DA2 and DA3 are the only ingress and egress points of the Facility, they are both immediate access roads through which mixing trucks and hauling vehicles carrying aggregate, fly ash, cement, concrete and waste product regularly traverse.

Furthermore, Section XVII.B.2 of the 2015 Permit states that industrial materials and activities "includes, but is not limited to, industrial material handling activities or equipment, machinery, raw materials, intermediate products, by-products, final products, and waste products." The regulations further explain that "material handling activities include storage, loading and unloading, transportation, or conveyance of any raw material, intermediate product, final product, by-product or waste product." *Id.* "If a stormwater discharge is associated with any of these activities, the discharger must obtain a permit and monitor the discharge." *Puget Soundkeeper Alliance v. Rainier Petroleum Corporation*, 2015 WL 13655379, at *9 (W.D. Wash. 2015).

As noted in Section 2.2, *supra*, materials handled by the Facility include fly ash and cement, the dust from which constitutes either raw materials or byproduct associated with the Facility's industrial operations. As the 2015 SWPPP itself acknowledges, the dust from these materials is pervasive throughout the site, including the driveways in DA2 and DA3. 2015 SWPPP § 6.3; Table 3. In addition, the definition of "industrial activities" includes the movement of mobile equipment, which tracks pollutants throughout the Facility, and off the Facility via the driveways in DA2 and DA3. In fact, the track out of pollutants is so extensive that the Facility Owner and/or Operator states that they contract the services of a street sweeper to sweep Simpson Way, outside the Facility's boundaries, two to three times per week. *See* City of Oceanside Inspection Reports; Letter from Robertson's to Regional Board, dated April 15, 2019. While Coastkeeper and CERF commend this practice, as the 2015 SWPPP acknowledges, "[c]ement dust is very fine and it is difficult to sweep up to a level that does not adversely impact storm water." 2015 SWPPP § 7.0. Thus, the ingress and egress driveways in DA2 and DA3 of the Facility are areas of industrial activity which are regulated by the Industrial General Permit, and which contribute pollutants to storm water discharged from the Facility. Therefore, the Robertson's Facility is in violation of the Industrial General Permit for failing to collect samples from these drainage areas each time samples are collected.

Members of CERF and San Diego Coastkeeper personally observed discharges from the Facility driveways at DA3/OF3 on April 10, 2020 during a large rain event, and at DA2/OF2 on

March 10, 2020 during a smaller rain event. No samples were taken. In light of the observed discharge during this smaller rain event, the Facility cannot credibly claim the driveways do not produce a discharge during larger rain events – especially those for which the Facility samples DA1/OF1.

The Robertson's Facility Owner and/or Operator also failed and continues to fail to collect the required number of storm water samples for each reporting period. For example, while the Industrial General Permit requires Permittees within a Compliance Group to collect two samples each reporting period, the Facility has failed to collect any storm water samples during the 2015–2016, 2016–2017, and 2017–2018 reporting periods, and only collected one sample during the 2018–2019 reporting period despite the occurrence of numerous QSEs during these time periods. *See* Ex. 1. Moreover, as evidenced in the City of Escondido's inspection records, the Facility discharged milky, muddy, discolored water on December 12, 2018, following a storm from the night prior which caused the discharge. However, the Facility Owner and/or Operator failed to collect any samples of these discharges. Additionally, the Regional Board's July 17, 2019 NOV cites the Facility's failure to collect the required number of storm water samples, specifically explaining,

> "According to the National Oceanic and Atmospheric Administration (NOAA), Escondido received 2.68 inches of precipitation from February 1st-5th, 2019. Samples were collected at the facility for this storm event. Escondido received 2.06 inches of precipitation from November 28th -30th, 2019 and 1.20 inches of precipitation from December 5th -7th, 2019 (see Attachment 1 of this NOV). These combined rain events, only 5 days apart, totaled 3.26 inches of precipitation. Samples were not collected at any time during or after either of these storm events. Thus, the Facility Owner and/or Operator has failed to collect stormwater samples in violation of the Industrial General Permit."

As such, the Facility has failed to collect the required number of storm water samples in violation of the Industrial General Permit.

The Facility Owner and/or Operator has failed and continues to fail to sample and analyze storm water discharges for all parameters required by the Industrial General Permit. As discussed in Section 2.2, *supra*, the Facility analyzes its storm water samples for only TSS, O&G, pH, and iron. The Robertson's Facility fails to comply with Sections XI.B.6.c–d of the 2015 Permit, which requires permittees to analyze samples for all pollutants associated with the Discharger's industrial activities. Specifically, the 2015 Permit requires Facility Owners and/or Operators to sample and analyze parameters on a Facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment. *Id*. § XI.B.6.c. As discussed in Section 3.4.3, *supra*, the Facility's pollutant source assessment is deficient and in violation of the Permit as numerous pollutants such as mercury, copper, chromium, hexavalent chromium, cadmium, nickel, manganese, lead, arsenic, zinc, aluminum, selenium, nitrogen, and phosphorus are likely present at the Facility and associated with its industrial activities. *See* Section 2.2, *supra*, (providing evidence and citations of the numerous

pollutants present at the Facility). As such, the Facility Owner and/or Operator's failure to analyze samples for these parameters violates the Industrial General Permit.

The Facility Owner and/or Operator also failed to comply with the Industrial General Permit's requirements for sample holding times and sample handling procedures. As noted by the Regional Board's July 17, 2019 NOV, the samples collected on February 5, 2019 "were not received by the lab until February 12, 2019 and the holding time of 7 [sic] days was exceeded for the approved test method (SM 2450-D)" for TSS in violation of the Permit. *See* 2015 Permit § XI.B.10. Additionally, the samples from February 5, 2019, and March 13, 2020 were not received by the laboratory within 48 hours, as required by Section XI.B.8 of the 2015 Permit. Further, the Robertson's Facility Owner and/or Operator failed to follow the Industrial General Permit's requirement to ensure the collection, preservation and handling of all storm water samples is in accordance with Attachment H of the Permit. Permit §XI.B.8. Specifically, for the February 5, 2019, December 7, 2019, and March 13, 2020 sampling events, the sample container was missing a label. (See, Permit Attachment H, ¶12). All of these samples were also improperly preserved – none of them were put on ice and all were well above 4 degrees Celsius, ensuring sample results would be of little use. (See, Permit Attachment H, ¶13).

Finally, the Industrial General Permit requires dischargers to conduct visual observations of storm water discharges, of authorized and unauthorized NSWDs, and of BMPs. Based on information available to Coastkeeper and CERF, including the Facility's numerous violations and failures to comply with numerous Permit provisions, the Robertson's Facility Owner and/or Operator fails to consistently, and/or adequately, conduct the required discharge observations and monitoring of BMPs.

Accordingly, the Robertson's Facility Owner and/or Operator has failed and continues to fail to adequately develop, implement, and/or revise a MIP, in violation of the Industrial General Permit. Every day the Facility operates with an inadequately developed and/or implemented MIP, or with an improperly revised MIP is a separate and distinct violation of the Industrial General Permit and the Clean Water Act. The Robertson's Facility Owner and/or Operator has been in daily and continuous violation of the Industrial General Permit MIP requirements since at least June 4, 2015. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since June 4, 2015.

### 3.6. <u>Failure to Comply with the Industrial General Permit's Reporting Requirements</u>.

Section B.14 of the 1997 Permit requires a permittee to submit an Annual Report to the Regional Board by July 1 of each year. Section B.14 requires that the Annual Report include a summary of visual observations and sampling results, an evaluation of the visual observation and sampling results, the laboratory reports of sample analysis, the annual comprehensive site compliance evaluation report, an explanation of why a permittee did not implement any activities required, and other information specified in Section B.13. The 2015 Permit includes the same reporting requirements with the Annual Report due July 15. *See* 2015 Permit § XVI.

The Robertson's Facility Owner and/or Operator has failed and continues to fail to submit Annual Reports that comply with Industrial General Permit reporting requirements. The 2015–2016, 2016–2017, 2017–2018, and 2018–2019 Annual Reports claim that the Facility failed to collect the requisite number of storm water samples due to a lack of qualifying discharges during business hours. For example, the 2018–2019 Annual Report claims that "[n]o qualifying storm water discharges occurred during the first half of the reporting year." This is directly contradicted by the City of Escondido inspection reports and photos showing a milky discharge coming from the Facility, in the middle of the day, during operating hours, on December 12, 2018. The City of Escondido inspection report specifically notes at 12:59 pm that the inspector "[t]racked [the] discharge upstream and found the source, Robertson's Ready Mix at 1310 Simpson Way. . . . Discolored water could be seen from the adjacent lumber yard (JW Lumber) coming from the discharge pipe in the channel." Furthermore, the Facility failed to collect a single storm water sample prior to February 5, 2019, and yet precipitation data indicates that numerous QSE's and sequential storm events occurred in the years prior to this date. Ex. 1. This data strongly indicates the Facility discharged storm water during business hours at various points prior to February 2019, and thus there were numerous opportunities to collect samples as required under the 2015 Permit. As such, the Robertson's Facility Owner and/or Operator has falsified information on numerous Annual Reports.

In each Annual Report since the filing of the 2015–16 Annual Report, the Robertson's Facility Owner and/or Operator certifies that: (1) a complete Annual Comprehensive Site Compliance Evaluation was conducted as required by the Industrial General Permit; (2) the SWPPP's BMPs address existing potential pollutant sources; and (3) the SWPPP complies with the Industrial General Permit, or will otherwise be revised to achieve compliance. However, information available to Coastkeeper and CERF indicates these certifications are erroneous. For example, Safety Director Andrew Arthur's certified of the 2018–2019 Annual Report which states "no qualifying storm water discharges occurred during the first half of the reporting year," when in fact there are photos and other evidence of precisely such a discharge. This certification is erroneous, and Mr. Arthur knew or should have known that the assertion that no QSEs occurred during this time period was a false statement.

Given that the Robertson's Facility Owner and/or Operator has submitted incomplete and/or incorrect Annual Reports that fail to comply with the Industrial General Permit, the Facility is in daily violation of the Industrial General Permit. Every day the Facility Owner and/or Operator conducts operations at the Facility without reporting as required by the Industrial General Permit is a separate and distinct violation of the Industrial General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owner and/or Operator has been in daily and continuous violation of the Industrial General Permit's reporting requirements every day since at least June 4, 2015. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since June 4, 2015.

## 4.   RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five years prior to the date of the Notice Letter. These provisions of law authorize civil penalties of $37,500.00 per day per violation for all Clean Water Act violations after January 12, 2009 and $55,800.00 per day per violation for violations that occurred after November 2, 2015, for penalties assessed on or after January 13, 2020.

In addition to civil penalties, Coastkeeper and CERF will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law. Lastly, pursuant to Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), Coastkeeper and CERF will seek to recover their litigation costs, including attorneys' and experts' fees.

## 5.   CONCLUSION

Coastkeeper and CERF are willing to discuss effective remedies for the violations described in this Notice Letter. However, upon expiration of the 60-day notice period, Coastkeeper and CERF intend to file a citizen suit under Section 505(a) of the Clean Water Act for the Robertson's Facility Owner and/or Operator's violations of the Industrial General Permit.

If you wish to pursue settlement discussions, please contact Coastkeeper and CERFs legal counsel:

| | |
|---|---|
| Matt O'Malley | Marco Gonzalez |
| Patrick McDonough | Livia Borak Beaudin |
| matt@sdcoastkeeper.org | livia@coastlawgroup.com |
| San Diego Coastkeeper | Coast Law Group, LLP |
| 2825 Dewey Road, Suite 207 | 1140 South Coast Highway 101 |
| San Diego, California 92106 | Encinitas, California 92024 |
| Tel: 619-758-7743 | Tel: 760-942-8505 |

Sincerely,

| | |
|---|---|
| Matt O'Malley | Marco Gonzalez |
| Patrick McDonough | Livia Borak Beaudin |
| Attorneys for San Diego Coastkeeper | Attorneys for Coastal Environmental Rights Foundation |

Notice of Intent to Sue: Clean Water Act
*Robertson's Ready Mix, Escondido Facility*
June 4, 2020
Page 27

## SERVICE LIST

<u>VIA U.S. MAIL</u>

David Gibson
Executive Officer
San Diego Regional Water Quality Control Board
2375 Northside Drive, Suite 100
San Diego, California 92108

Andrew Wheeler, Administrator
Environmental Protection Agency
Office of the Administrator 1101A
1200 Pennsylvania Ave N.W
Washington, DC 20460

John Busterud
Regional Administrator
U.S. Environmental Protection Agency
Region IX
75 Hawthorne Street
San Francisco, California 94105

Eileen Sobeck
Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812–0110

**Exhibit 1: Precipitation Data for Robertson's Ready Mix Escondido Batch Plant**

National Oceanic & Atmospheric Administration
National Environmental Satellite, Data, and Information Service
Record of Climatological Observations
Station: San Marcos 2.5 ENE, CA US, US1CASD0001
Location Elev: 203 m., Lat: 33.1472° N, -117.1316° W

| Date | Daily Precipitation (inches) | Date | Daily Precipitation (inches) |
|---|---|---|---|
| 5/22/2015 | 0.3 | 1/31/2016 | 0.1 |
| 5/23/2015 | 0.01 | 2/1/2016 | 0.85 |
| 7/1/2015 | 0.12 | 2/18/2016 | 0.11 |
| 7/2/2015 | 0.02 | 2/19/2016 | 0.02 |
| 7/19/2015 | 0.41 | 3/6/2016 | 0.08 |
| 7/20/2015 | 0.53 | 3/7/2016 | 0.51 |
| 8/26/2015 | 0.01 | 3/12/2016 | 0.25 |
| 9/10/2015 | 0.07 | 3/14/2016 | 0.06 |
| 9/16/2015 | 0.99 | 3/28/2016 | 0.01 |
| 10/4/2015 | 0.15 | 3/29/2016 | 0.04 |
| 10/5/2015 | 0.12 | 4/8/2016 | 0.4 |
| 10/6/2015 | 0.13 | 4/9/2016 | 0.02 |
| 11/3/2015 | 0.12 | 4/10/2016 | 0.42 |
| 11/4/2015 | 0.03 | 4/30/2016 | 0.01 |
| 11/10/2015 | 0.18 | 5/1/2016 | 0.09 |
| 11/25/2015 | 0.07 | 5/6/2016 | 0.28 |
| 11/27/2015 | 0.27 | 5/7/2016 | 0.21 |
| 12/11/2015 | 0.09 | 5/25/2016 | 0.02 |
| 12/12/2015 | 0.53 | 9/21/2016 | 0.28 |
| 12/14/2015 | 0.19 | 9/22/2016 | 0.04 |
| 12/19/2015 | 0.13 | 10/18/2016 | 0.04 |
| 12/22/2015 | 0.36 | 11/21/2016 | 0.56 |
| 12/23/2015 | 0.54 | 11/22/2016 | 0.05 |
| 12/25/2015 | 0.12 | 11/27/2016 | 0.56 |
| 12/29/2015 | 0.04 | 11/28/2016 | 0.05 |
| 1/4/2016 | 0.04 | 12/16/2016 | 1.05 |
| 1/6/2016 | 1.62 | 12/17/2016 | 0.82 |
| 1/7/2016 | 1.25 | 12/21/2016 | 0.08 |
| 1/8/2016 | 0.13 | 12/22/2016 | 0.65 |
| 1/10/2016 | 0.03 | 12/23/2016 | 0.22 |
| 1/20/2016 | 0.03 | 12/24/2016 | 1.2 |
| 1/24/2016 | 0.07 | 12/25/2016 | 0.01 |

**Exhibit 2: Precipitation Data for Skyline Recycling Facility**

| Date | Daily Precipitation (inches) | Date | Daily Precipitation (inches) |
|---|---|---|---|
| 12/31/2016 | 0.12 | 1/10/2018 | 1.65 |
| 1/1/2017 | 0.69 | 2/12/2018 | 0.04 |
| 1/2/2017 | 0.02 | 2/19/2018 | 0.02 |
| 1/3/2017 | 0.03 | 2/23/2018 | 0.13 |
| 1/5/2017 | 0.03 | 2/27/2018 | 0.53 |
| 1/6/2017 | 0.32 | 2/28/2018 | 0.1 |
| 1/10/2017 | 0.3 | 3/3/2018 | 0.11 |
| 1/11/2017 | 0.06 | 3/11/2018 | 0.63 |
| 1/12/2017 | 0.13 | 3/14/2018 | 0.2 |
| 1/13/2017 | 0.75 | 3/15/2018 | 0.45 |
| 1/19/2017 | 0.49 | 3/23/2018 | 0.15 |
| 1/20/2017 | 0.49 | 5/2/2018 | 0.01 |
| 1/21/2017 | 1.54 | 5/3/2018 | 0.06 |
| 1/22/2017 | 0.02 | 5/20/2018 | 0.01 |
| 1/23/2017 | 1.96 | 5/21/2018 | 0.01 |
| 1/24/2017 | 0.33 | 5/24/2018 | 0.09 |
| 2/6/2017 | 0.02 | 5/30/2018 | 0.01 |
| 2/7/2017 | 0.18 | 10/4/2018 | 0.26 |
| 2/12/2017 | 0.13 | 10/13/2018 | 0.45 |
| 2/18/2017 | 1.43 | 11/22/2018 | 0.28 |
| 2/19/2017 | 0.24 | 11/23/2018 | 0.08 |
| 2/27/2017 | 0.61 | 11/30/2018 | 1.43 |
| 2/28/2017 | 3.6 | 12/2/2018 | 0.04 |
| 3/6/2017 | 0.11 | 12/6/2018 | 0.82 |
| 3/22/2017 | 0.02 | 12/7/2018 | 0.96 |
| 3/23/2017 | 0.04 | 12/26/2018 | 0.65 |
| 4/19/2017 | 0.01 | 1/6/2019 | 0.57 |
| 5/7/2017 | 0.63 | 1/12/2019 | 0.21 |
| 5/8/2017 | 0.83 | 1/13/2019 | 0.51 |
| 5/16/2017 | 0.04 | 1/15/2019 | 0.21 |
| 6/1/2017 | 0.02 | 1/16/2019 | 0.79 |
| 6/11/2017 | 0.01 | 1/17/2019 | 0.08 |
| 7/25/2017 | 0.06 | 1/18/2019 | 0.21 |
| 9/9/2017 | 0.03 | 1/21/2019 | 0.04 |
| 9/22/2017 | 0.02 | 2/1/2019 | 0.92 |
| 11/19/2017 | 0.02 | 2/2/2019 | 0.06 |
| 1/9/2018 | 1.35 | 2/3/2019 | 1.1 |

**Exhibit 2: Precipitation Data for Skyline Recycling Facility**

| Date | Daily Precipitation (inches) | Date | Daily Precipitation (inches) |
|---|---|---|---|
| 2/4/2019 | 0.15 | 12/7/2019 | 0.08 |
| 2/5/2019 | 0.59 | 12/8/2019 | 0.04 |
| 2/10/2019 | 0.03 | 12/24/2019 | 0.92 |
| 2/14/2019 | 1.87 | 12/26/2019 | 1.36 |
| 2/15/2019 | 1.88 | 12/27/2019 | 0.4 |
| 2/16/2019 | 0.19 | 1/17/2020 | 0.24 |
| 2/18/2019 | 0.1 | 1/21/2020 | 0.41 |
| 2/19/2019 | 0.05 | 2/3/2020 | 0.04 |
| 2/20/2019 | 0.04 | 2/10/2020 | 0.38 |
| 2/21/2019 | 0.26 | 2/23/2020 | 0.34 |
| 2/22/2019 | 0.18 | 3/2/2020 | 0.04 |
| 3/2/2019 | 0.2 | 3/10/2020 | 0.66 |
| 3/3/2019 | 0.06 | 3/11/2020 | 0.44 |
| 3/6/2019 | 0.2 | 3/12/2020 | 0.1 |
| 3/12/2019 | 0.38 | 3/13/2020 | 1.75 |
| 3/13/2019 | 0.03 | 3/17/2020 | 0.7 |
| 3/21/2019 | 0.24 | 3/18/2020 | 0.03 |
| 4/3/2019 | 0.18 | 3/19/2020 | 0.9 |
| 4/29/2019 | 0.08 | 3/23/2020 | 0.57 |
| 5/1/2019 | 0.28 | 3/25/2020 | 0.08 |
| 5/7/2019 | 0.15 | 3/26/2020 | 0.3 |
| 5/12/2019 | 0.15 | 3/27/2020 | 0.08 |
| 5/20/2019 | 0.69 | 4/6/2020 | 0.2 |
| 5/22/2019 | 0.02 | 4/7/2020 | 1.2 |
| 5/27/2019 | 0.25 | 4/8/2020 | 0.47 |
| 6/17/2019 | 0.02 | 4/9/2020 | 0.28 |
| 6/18/2019 | 0.01 | 4/10/2020 | 1.29 |
| 9/5/2019 | 0.12 | 4/11/2020 | 3.2 |
| 9/27/2019 | 0.02 | 4/13/2020 | 0.09 |
| 9/29/2019 | 0.27 | 4/18/2020 | 0.02 |
| 11/20/2019 | 1.54 | 5/11/2020 | 0.03 |
| 11/21/2019 | 0.51 | | |
| 11/28/2019 | 0.4 | | |
| 11/29/2019 | 1.95 | | |
| 11/30/2019 | 0.19 | | |
| 12/4/2019 | 0.35 | | |
| 12/5/2019 | 1.22 | | |